SECURITIES AND EXCHANGE
COMMISSION, Plaintiff,

v.

Dominick MUSELLA, Albert J. Deangelis, Anthony Brunetti, Thomas Dispigno, Richard I. Rosenkranz, John Musella, Edward O'Neill, Richard B. Martin, Alan Robert Ihne, James Stivaletti, Daniel Covello, and James Covello, Defendants.

No. 83 Civ. 342–CSH.

United States District Court,
S.D. New York.

As Amended Jan. 24, 1984.

Steven M. Rosenberg, David W. Spears, S.E.C., Washington, D.C., Anne C. Flannery, S.E.C., New York City, for plaintiff.

Lawrence Iason, New York City, for defendant Daniel Covello.

Kronish, Lieb, Shainswit, Weiner & Hellman, New York City, for defendant James Covello; Alan Levine, New York City, of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

The Securities and Exchange Commission ("Commission") seeks a preliminary injunction against defendants James and Daniel Covello barring the Covellos from future violations of sections 10(b) and 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78n(e), and Rules 10b–5 and 143–3 promulgated thereunder, 17 C.F.R. §§ 240.10b–5 and 240.14e–3. The Commission also seeks to freeze certain identified profits from allegedly illegal trades made by the Covellos, as well as all profits realized by the Covellos on trades in any of the stocks at issue in this proceeding.

In a Memorandum Opinion and Order dated November 22, 1983, familiarity with which is assumed, this Court denied the Commission's request for a temporary restraining order against the defendants Covello and a third defendant, James Stivaletti. The matter was set down for an evidentiary hearing on December 8, 1983. Prior to that hearing, Stivaletti joined certain other defendants in this action in consenting to a full preliminary injunction and an asset freeze pending the entry of final judgment. Accordingly, the motion presently before me seeks relief only with respect to the Covellos.

In addition to evidence presented in connection with the December 8, 1983 hearing, this Court will also be considering newly discovered evidence presented by the Commission in two supplemental memoranda dated January 12 and 16, 1984. To expedite a decision in this matter, defendants have agreed that the facts set forth in these memoranda may be admitted into evidence for the limited purpose of this motion without additional testimony or affidavits. Before turning to a consideration of plaintiff's motion for injunctive relief, I will first address two preliminary issues raised at the December 8 hearing. .

## I.

### The Hearsay Evidence

In a Memorandum Opinion and Order of December 9, 1983, familiarity with which is assumed, this Court admitted into evidence certain disputed material, to wit, the admissions underlying summaries of the Musella group's trading activities (Px 3) and the affidavit of Yiu Wung Kai (Px 5). The parties were invited, however, to address the question of whether a record composed, at least in part, of hearsay declarations would be sufficient to justify preliminary injunctive relief. The evidence having been admitted, the present issue is its weight, absent the benefits to be derived from live testimony and cross-examination.

After evaluating the nature of the disputed materials, I conclude that their reliability is such as to warrant their full consideration. The Second Circuit's opinion in *SEC v. Frank*, 388 F.2d 486 (2d Cir.1968), is illuminating in this regard. In *Frank*, the Court addressed the necessity of holding an evidentiary hearing in the context of a preliminary injunction motion. While such a hearing is clearly appropriate in "cases where everything turns on what happened and that is in sharp dispute," *id.* at 491, the Court endorsed a far more flexible view in instances where, as here, "there is little dispute as to the raw facts but much as to the inferences to be drawn from them, as well, perhaps, as to the meaning and applicability of the governing statute or common law rule." *Id.* at 490. In such cases, although "an evidentiary hearing would be of … value and should be held whenever practicable," the need for a "trial-type hearing" is not as compelling. *Id.* at 490. With respect to the documents at issue here, this is not an instance where defendants have proffered conflicting evidence to contest the "raw facts," but rather one in which they strenuously dispute the inferences to be drawn from those facts. If under the distinctions drawn in *Frank* an evidentiary hearing may be entirely dispensed with, given the exigent nature of an application for preliminary re-

lief, then *a fortiori* the Court may give full weight to particular evidence it deems reliable, even if such evidence is not presented by way of live testimony or subject to cross-examination.

Turning to the particular exhibits in question, each is in some sense inherently trustworthy. The Musella group trading summaries were served on the individual defendants involved in the form of requests to admit, and they have been admitted after presumably thorough consultation with counsel. (Tr. at 8–9). Defendants' objection on hearsay grounds that these are not admissions of the Covellos but rather of other party defendants, and that the documents are therefore inadmissible at this proceeding, was addressed and rejected in this Court's prior ruling. But the fact that these individuals *are* defendants with an equally strong interest in the outcome of the litigation does serve as an indicia of the evidence's trustworthiness. Little purpose would be served, and much time consumed, by requiring each of the Musella group defendants to testify individually as to the accuracy of the extensive data compilations received in connection with the testimony of the Commission's financial analyst.

I also find the affidavit of Yiu Wung Wai, the chief accountant at the Hotel Singapore, worthy of this Court's full consideration. While Mr. Yiu's oral testimony would of course be preferable, the nature of the averments made by Mr. Yiu and the nature of defense counsel's objection to that document render this a proper case in which to rely, at least at this preliminary stage, on a written submission. In directing that a party present live testimony rather than affidavits, a court's primary concern is to afford opposing counsel an opportunity to cross-examine the witness. The benefit of such a dialogue is that it permits the Court to evaluate the witness's demeanor and credibility, an important factor in instances where the facts presented are sharply contested or where a particular witness's credibility is in dispute. *See SEC v. Vesco,* 358 F.Supp. 1186, 1189 (S.D.N.Y. 1973).

This is not such a situation. Mr. Yiu is, to all appearances, a disinterested witness whose testimony has been elicited to authenticate registration, restaurant, and telephone records from the Hotel Singapore. Defense counsel's specific objection at the December 8, 1983, hearing focused on the legibility of a telephone number said to reflect a long-distance collect call from James Stivaletti to Alan Ihne on February 9, 1982. (Px 5, Ex. G). Counsel professed an interest in examining the affiant to ascertain how Mr. Yiu could determine from this document that the "number is what he says it is." (Tr. at 72).

After examining the original of the disputed document, I concur with defense counsel's view that the eighth digit of the recorded telephone number is severely smudged. The Commission's assertion that this number is "clearly legible as a '2'" reflects either wishful thinking or counsel's superior eyesight. But the fact finder's vision, failing though it may be, controls; and my examination of the telephone slip, under a bright light and aided by a magnifying glass, reveals only an indecipherable smudge in place of this digit. The hotel's accounting stamp is superimposed upon it. If this were the only evidence proffered with respect to the alleged February 9 Stivaletti-Ihne phone call, defense counsel's argument as to the necessity of cross-examining Mr. Yiu would be far more compelling. However, in his deposition testimony of December 2, 1983, Stivaletti responded to the question, "Did you place any calls to the U.S.?" with the following: "I called Albert Ihne. I thanked him for driving me to the airport." (Stivaletti Dep. at 65). While no date was specified, New York Telephone Company records indicate that, on February 9, 1982, a collect call was made from the Hotel Singapore to Alan Ihne's home telephone number. (Gutowski Dep. at 8; Px 7). The evidence indicates, therefore, that Stivaletti called Ihne's home phone number—212–763–2213—at some point during his stay in Hong Kong; that Ihne received a collect call from the Hotel Singapore on February 9, 1982; and that the Hotel Singapore put

through a call from Mr. Stivaletti on February 9, 1982, to the number 212–763–2_13.

The inference to be drawn therefrom—that Stivaletti called Ihne on February 9—is at least reasonable, if not compelling. But in any case defense counsel will have an opportunity to challenge Mr. Yiu's testimony prior to or at trial. Mr. Spears has represented to the Court that the Commission "intends to undertake a procedure whereby the courts of this country make a request of the courts of Hong Kong for judicial assistance in obtaining the testimony" of Mr. Yiu, thereby enabling counsel to "observe this witness and to cross-examine him." (Tr. at 74). For the purpose of the motion presently before me, however, I find no reason to question Mr. Yiu's credibility, the reliability of the affidavit offered in evidence, or the inference it supports, i.e., that Mr. Stivaletti called Mr. Ihne from Hong Kong on February 9, 1982.

*The Fifth Amendment Privilege in a Civil Proceeding*

██ Both Daniel and James Covello, asserting their Fifth Amendment privilege against self-incrimination, have refused to respond to questions posed by the Commission during their respective depositions. (Px 8 and 9). They have, for example, refused to testify about the existence of other brokerage accounts here or abroad, or about trading in any of the other stocks at issue in this proceeding. Similarly, they have declined to produce certain trading records sought by the Commission. Plaintiff urges the Court to draw an adverse inference from this assertion of the privilege. Defendants argue generally that the nature of an SEC enforcement proceeding, coupled with the fact that defendants are targets of a parallel criminal investigation, is sufficient to implicate the same policy considerations that make it impermissible to draw such an inference against a defendant in a criminal proceeding.

I appreciate and am sensitive to the competing policy rationales that have arisen in connection with a party's assertion of the Fifth Amendment privilege in a civil context. Certainly the issue becomes far more complex where, as here, conduct giving rise to civil liability also constitutes an element of a crime. On the other hand, given the extreme difficulty in successfully challenging an individual's reliance on the privilege, *see, e.g., Hoffman v. United States*, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951); *Malloy v. Hogan*, 378 U.S. 1, 11–12, 84 S.Ct. 1489, 1495, 12 L.Ed.2d 653 (1964); *Emspak v. United States*, 349 U.S. 190, 198 n. 18, 75 S.Ct. 687, 692 n. 18, 99 L.Ed. 997 (1955), it would seem proper to afford a civil litigant stymied by his adversary's silence some means of moderating the potentially overwhelming disadvantage he faces in establishing his case. In instances of insider trading, where the nature of the violation makes the proof inherently difficult to obtain, assertion of the privilege may lead to a complete failure of proof.

I am not concerned with the motives of defense counsel in advising their clients to assert the privilege. But such a defense strategy clearly cripples plaintiff's efforts to conduct meaningful discovery and to marshal proof in an expeditious fashion, if at all. The delay thereby generated is, in my view, an especially significant factor with respect to the application presently before the Court. The Commission seeks, at a relatively early stage in the proceedings, to preliminarily enjoin defendants from future violations of the securities laws and to freeze certain of their assets prior to entry of final judgment. The objective, of course, is to ensure that defendants' assets will remain available to satisfy any future court order to disgorge illegal profits. In short, the nature of the relief sought is such as to require the Commission to put forth proof well in advance of trial, and before the completion of pretrial discovery, to ensure that a future disposition of the case in its favor will be meaningful.

In light of these various factors, I am inclined to conclude that, in determining the sufficiency of plaintiff's showing on an application for preliminary relief, the Court should draw an adverse inference from defendants' assertion of the privilege. I am

well aware that this decision may tip the balance in cases where, as here, the evidence is largely circumstantial and demands a certain degree of mental agility on the part of the Court to draw the proper inferences from the disparate facts presented. The law of this Circuit, however, supports the view that the assertion of the privilege in a civil proceeding is materially different from its invocation in a criminal proceeding, and may be treated as such.

The Second Circuit's most recent discussion of the privilege in a civil context arose out of Judge Weinfeld's ruling that witnesses in a civil trial could be questioned about their knowledge of, and participation in, certain thefts of parking meter revenues, and that their refusal to answer was competent and admissible evidence against their employer, Brink's Inc. In its summation, the City relied on the witness's refusal to testify as circumstantial evidence in support of its claim against Brink's. The district court mentioned this reliance in its charge to the jury and instructed them as follows: "You may, but need not, infer by such refusal that the answers would have been adverse to the witness' interest."

The Court of Appeals, after noting that its "[p]revious decisions … lend logical support to different treatment of claims of privilege in criminal and civil cases," *Brink's Inc. v. City of New York*, 717 F.2d 700, 709 (2d Cir.1983), observed that "earlier decisions limiting the inferential use of such claims were rooted in factors unique to the criminal context...." *Id.* While the court recognized that in a jury trial the probative value of such evidence might, in certain instances, be outweighed by its inflammatory effect and the consequent danger of undue prejudice, factors not pertinent here, it concluded that claims of privilege were admissible and competent evidence "given the fact that there is no constitutional mandate against their admission." *Id.* at 710.

In *Baxter v. Palmigiano*, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976), a case involving a prison disciplinary proceeding with sanctions arguably akin to a criminal proceeding, the Supreme Court upheld a disciplinary board's decision to place an inmate in punitive segregation for thirty days and to downgrade his status classification, despite the fact that the board's decision was based in part on the adverse inference drawn from the inmate's invocation of his privilege not to testify. The Court states as follows:

"Our conclusion is consistent with the prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment 'does not preclude the inference where the privilege is claimed by a *party to a civil cause.*' 8 J. Wigmore, Evidence 439 (McNaughton rev. 1961)." *Id.* at 318, 96 S.Ct. at 1558 (emphasis in original).

Subsequently, in *Lefkowitz v. Cunningham*, 431 U.S. 801, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977), the Court made clear that although a sanction cannot be automatically imposed on an individual merely because he or she chooses to invoke the privilege, an adverse inference can "be drawn in a civil case from a party's refusal to testify," provided this is "only one of a number of factors to be considered by the finder of fact in assessing a penalty...." *Id.* at 808 n. 5, 97 S.Ct. at 2137 n. 5. *See also SEC v. Scott*, 565 F.Supp. 1513, 1533 (S.D.N.Y. 1983) ("an adverse inference may be drawn against parties to civil actions when they refuse to testify in response to probative evidence offered against them").

Having carefully considered the arguments of counsel and the relevant case law, I conclude that defendants' refusal to testify and to produce pertinent records is a factor that may be considered by the Court. Certainly the relief sought here—an injunction against future § 10(b) and § 14(e) violations and maintenance of the status quo with respect to certain assets pending a trial on the merits—is less oppressive than the penalties upheld by the Supreme Court in *Baxter, supra.* Further, while I would

be loathe to impose a penalty for invocation of the privilege on a civil litigant who is currently a defendant in a parallel criminal prosecution—given the invitation to prosecutorial abuse this might entail—the situation is somewhat different where the invoker is not facing trial but rather is a target of a grand jury investigation. The distinction may come as cold comfort to the target, but I regard it as meaningful in law. To bar the inferential value of a party's refusal to testify in an ongoing civil proceeding based only on the possibility, however real or remote, of future prosecution would disregard the explicit distinction between civil and criminal proceedings endorsed by the courts in both *Baxter* and *Brinks, supra. See also Scott, supra,* 565 F.Supp. at 1533–34, n. 33 (defendant's contention "that it would be unreasonable to expect him to waive his privilege in light of the grand jury investigation into the John Muir firm ... does nothing to persuade the Court against [drawing an adverse] inference" from his failure to testify).

I turn now to a review of the evidence presently before the Court.

## II.

Both Daniel and James Covello have been involved in the securities business for well over a decade. Daniel Covello is a vice-president and corporate bond trader at Dean Witter Reynolds, Inc., in New York City. His brother James Covello is a corporate bond trader with Gintel & Co. in New York City.

Alan Robert Ihne, until he was named as a defendant in this action, was the manager of the office services department at Sullivan & Cromwell ("Sullivan"), a New York City law firm. (Tr. at 52). He is presently on a leave of absence from the firm. Also named as defendants in this action are eight individuals—Dominick Musella, Al-

bert DeAngelis, Thomas Dispigno, Richard Rosenkranz,[1] John Musella, Anthony Brunetti, Edward O'Neill, and Richard Martin—known collectively for the purposes of this proceeding as the "Musella group."[2] The Commission does not presently suggest any direct connection between the Musella group and the Covellos. The activities of the Musella group are probative, however, with respect to the assertion that Alan Ihne was the individual at Sullivan & Cromwell, who, on at least four occasions, simultaneously disclosed non-public material market information to one or both of the Covellos and to the Musella group. Summaries of the Musella group's trading activities (Px 3), which were served on those defendants as requests to admit and have been admitted, reveal that the Musella group purchased Marathon Oil, Steiger Tractor, Tesoro Petroleum, and MAPCO, Inc. securities on the same day as, or shortly after, one or both Covellos traded in those securities.[3] I will consider each of these transactions, and Sullivan's connection to them, in turn.

### The Trades

On October 29 and 30, 1981, Daniel and James Covello purchased a total of 70 Marathon call options at a price of $41,636 (Px 1 and 2); the Musella group purchased a total of 445 Marathon call options at a price of $152,022.48 on October 29, 1981. (Tr. at 18, Px 3). On the morning of October 30, 1981, shortly after each of the Covellos bought additional Marathon options, trading was halted in Marathon pending the announcement later that day of the Mobil Oil Corporation's tender offer for Marathon Oil. Sullivan & Cromwell was retained on October 27, 1981, by Merrill Lynch, Pierce, Fenner & Smith ("Merrill Lynch"), Mobil's dealer/manager in the tender offer, to provide legal services in

---

1. During the pendency of this motion, Richard Rosenkranz consented to the entry of a judgment of permanent injunction.

2. Each of these defendants has already consented to a full preliminary injunction.

3. In order to expedite the hearing on this motion, the Covellos have entered into a stipulation with regard to their trading records at Dean Witter Reynolds, Inc. These records were received in evidence at the December 8 hearing as plaintiffs' exhibits 1 and 2.

connection with the Mobil-Marathon take-over. (Tr. at 45–46).

On February 11, 1982, Sullivan was retained by Morgan Stanley & Co., Inc., to provide legal services in connection with a proposed reorganization of Tesoro Petroleum Corporation. At that time, Morgan Stanley was acting as financial advisor to a special advisory committee of Tesoro's board of directors. In mid-May 1982, Sullivan was specifically involved in reviewing a proposed leveraged buy-out of Tesoro's assets, a proposal that was never carried through. (Tr. at 48–49). On May 19, 1982, Daniel Covello bought 2000 shares of Tesoro for a price of $42,862,[1] and James Covello bought 2,000 shares of Tesoro and 60 Tesoro call options for a total price of $59,551. (Px 1 and 2). Over a four-day period commencing May 18, 1982, members of the Musella group purchased 515 Tesoro call options and 57,000 Tesoro shares for a total price of $1,434,221.14. (Tr. at 19–20; Px 3).

Sullivan was also retained on July 29, 1982, by Klockner, Humboldt & Deutz, A.G., to render legal services in connection with a proposed acquisition by that company of all the outstanding stock of Steiger Tractor, Inc. (Tr. at 50–51). On August 26, 1982, Daniel Covello purchased 1,500 Steiger shares for $12,232. (Px 1). On that same day, James Covello purchased 3000 shares of Steiger through his account at Paine Webber Jackson & Curtis for $22,603.35. (Pl.Supp.Mem. of Jan. 16, 1984). Commencing on August 26, 1982, and continuing through the next day, Dominick Musella purchased a total of 15,000 Steiger shares for $119,612. (Tr. at 20, Px 3). According to the testimony of Edward Harrington, a financial analyst for the Securities and Exchange Commission, a review of the trading in Steiger common stock during the period July 1, 1982 through September 30, 1982, indicates that the stock was "thinly traded," with generally little activity overall and no transactions at all on some

days. Dominick Musella's August trades account for approximately 47 percent of the Steiger shares traded during that two-day period. (Tr. 21–22).

Finally, on January 12, 1982, Sullivan was retained by Peter Kiewit Sons, Inc. to assist in the filing of Form 13D's in connection with the acquisition of securities in MAPCO, Inc. Evidence discovered by the Commission after the hearing on the preliminary injunction motion, and subsequently admitted into evidence on consent of counsel, shows that, on January 18, 1982, James and Daniel Covello opened consecutively numbered accounts at a Long Island branch of Josephthal & Co., Inc., a New York brokerage firm. The following day, James Covello purchased thirty call options in MAPCO, Inc. for a total price of $3,586.33. (Pl.Supp.Mem. of Jan. 12, 1984 at 2). Beginning on January 25, 1982, and continuing through March 11, 1982, three members of the Musella group also made substantial purchases of MAPCO call options. *Id.* at 2–3.

Although the only presently known trades made by the Covellos in securities bearing some direct or indirect connection to the Sullivan firm are the four noted above, the Musella group traded in several others as well. One of those corporations, Signode, is of interest in the present proceeding for reasons that will become apparent. In early December 1981 Sullivan & Cromwell was retained by Merrill Lynch to perform legal services in connection with a proposed reorganization of Merrill Lynch's client, the Signode Corporation, specifically, a leveraged buy-out involving the purchase of all outstanding Signode stock. (Tr. at 47). During January and February of 1982 Sullivan was actively engaged in preparing a merger agreement and related documents. (Tr. at 48). Beginning on February 9, 1982, and on a continuous basis through February 26, 1982, members of the Musella group purchased a total of 34,300

---

**4.** Edward Harrington, a financial analyst for the Securities and Exchange Commission, testified from his review of the Covellos' trading records that Daniel Covello purchased 500 shares of Tesoro Petroleum on May 19, 1982. (Tr. at 19). However, as these records clearly reflect, Daniel Covello purchased a total of 2000 shares on that date. (Px 1).

shares of Signode at a price of $1,403,245. (Tr. at 22–24). On March 1, 1982, Signode publicly announced a leveraged buy-out of all its stock at a premium over market price. (Tr. at 47).

*Stivaletti, Ihne, and the Hong Kong Phone Calls*

At this point, a defendant not yet mentioned with respect to this motion must be introduced. James Stivaletti, a registered representative with the brokerage firm Herzog Heine Geduld, Inc., acted during periods prior to the trading at issue in this lawsuit as a broker for defendants John Musella, Edward O'Neill and Richard Martin. (Tr. at 59–60). None of these defendants, however, used Stivaletti in connection with any of the trades at issue in this case. Mr. Stivaletti also testified that he is a "drinking buddy" of Alan Ihne, that he and Ihne have gone drinking on numerous occasions both on weekends and on week nights, that they have called one another on the telephone at home and at work to arrange these get-togethers, and that on one occasion Stivaletti accompanied Ihne and others on a fishing trip. (Tr. at 60–63). When asked if he recognized anyone in the courtroom who was present during that trip, he pointed toward the Covellos and stated, "Maybe one of those. I don't know." (Tr. at 63). In subsequent testimony, John Monahan, a fellow employee of Ihne at Sullivan, identified Stivaletti as a man he had seen on James Covello's boat during a Saturday fishing trip. (Tr. at 96).

On February 5, 1982, Stivaletti travelled to Hong Kong and moved into Room 805 of the Singapore Hotel. Telephone charge records maintained by the hotel indicate that, on February 9, 1982—the date the Musella group's trading in Signode commenced—two phone calls arguably relevant to this proceeding were charged to that room. At 1:45 p.m. Hong Kong time, which is 12:45 a.m. New York time, "Mr. James"[5] in Room 805 placed a collect call to a "Mr. Monsignor" at a number that, with the exception of a smudged eighth digit, coincides with Alan Ihne's home telephone number. (Px 5, Ex. G). As discussed earlier in this opinion with respect to the Yiu affidavit, *see* Part I, *supra,* I infer that the call was, in fact, made to the Ihne residence, despite the partial obliteration of one of the numerals recorded. To conclude otherwise would ask too much of coincidence. Fifteen minutes later, a second call was made from "Mr. James" in Room 805 to "Mr. Dominick" at 212–474–7397, which is Dominick Musella's home telephone number. (Px 5, Ex. H).

*Ihne's Friendship with James Covello*

Alan Ihne, in addition to being a drinking partner of Stivaletti, has been a close friend of James Covello for a number of years. Ihne's cousin, Theresa Balsamo, testified that twice within the last year she has seen James Covello at Ihne's house. (Tr. at 85–86). Ihne's fellow employee at Sullivan, John Monahan, has known Ihne since their childhood together in Brooklyn and was introduced to James Covello by Ihne about ten years ago. At that time, the Covellos were living in the same Brooklyn neighborhood as Ihne and Monahan. Over the years, Monahan has occasionally seen James Covello meet Ihne at Sullivan after hours prior to going out, has seen Covello at the Sullivan Christmas party, and has joined James Covello, Ihne, and other friends for dinner at Ihne's house. Over the last four years, Monahan, Ihne and other friends have gone on fishing trips on James Covello's boat. These trips have occurred as frequently as every Saturday during the past year. On two occasions, in February of 1982 and March of 1983, Monahan went to Florida with James Covello and other Sullivan employees in the office services department. During the 1983 trip, the group stayed in Covello's condominium in West Palm Beach. Al-

---

5. The Commission suggests that the reference to "Mr. James," rather than to "Mr. Stivaletti," on phone records of calls emanating from Room 805 is explained by the fact that the surname in Chinese precedes the first name, an explanation I accept. It finds further support in the fact that phone calls to Dominick Musella's home phone number were recorded by the Hotel Singapore as calls placed to "Mr. Dominick."

though Ihne did not go on these trips, he vacationed in James Covello's Florida condominium with his family in early 1983. (Tr. 90–95).

Bruce Arch, also an employee in Sullivan's office services department and a friend of Alan Ihne, has known James Covello for about seven years. He, too, has seen Covello meeting Ihne and other friends after hours at Sullivan, has been at Ihne's house when Covello was present, and has gone on fishing trips locally and in Florida with Ihne, James Covello, and other service department employees. (Tr. at 102–105).[6]

### III.

*The Motion for a Preliminary Injunction*

Before turning to the inferences to be drawn from this extensive, albeit fragmentary, record, the legal standards governing the Commission's application must be addressed.

■ Section 21(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u(d), authorizes the Commission to seek permanent or temporary injunctive relief whenever it appears that a person "is engaged or is about to engage in acts or practices constituting a violation of [the Act]." The district court is directed by the terms of the statute to grant such relief "upon a proper showing," an obligation with well-defined parameters in this Circuit. To satisfy the "proper showing" requirement, the Com-

mission must establish a "strong *prima facie* case" of the violations alleged, *SEC v. Boren*, 283 F.2d 312, 313 (2d Cir.1960), as well as demonstrate that "there is a reasonable likelihood that the wrong will be repeated." *SEC v. Manor Nursing Centers*, 458 F.2d 1082, 1100 (2d Cir.1972). *See SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 807 (2d Cir.1975). It is not necessary, however, as in the case of a nonstatutory injunction, for the Commission to demonstrate irreparable injury or lack of a legal remedy. *SEC v. Scott*, 565 F.Supp. 1513, 1536 (S.D.N.Y.1983).

The Commission strenuously argues that it has made the requisite showing and is entitled to the relief it seeks. Defendants contend that the Commission's showing is wholly insufficient with respect to both the violations alleged and the likelihood of a future recurrence. Because the elements necessary to demonstrate a § 10(b) and Rule 10b–5 violation are more extensive, and to some extent encompass, the elements that must be shown to establish a violation of § 14(e) and Rule 14e–3, I will first address the Commission's showing with respect to the former provision.

*Section 10(b) and Rule 10(b)–5*

■ The Commission's theory with respect to the Covellos' alleged violations of § 10(b) and Rule 10b–5[7] is that defendants are "tippees" who traded in the stocks identified in this proceeding while in possession of material, non-public information

---

**6.** Covello is also sufficiently friendly with Leonard DiRusso, Ihne's cousin, to have listed him as a personal reference on a 1974 job application. At that time, he stated he had known DiRusso for five years. (Px 2). During the period in question in this proceeding, DiRusso was an assistant manager of office services at Sullivan.

**7.** Section 10(b) makes it "unlawful for any person ... [t]o use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."
Pursuant to its rulemaking power under this section, the Commission promulgated Rule 10b–5, which provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
17 C.F.R. § 240.10b–5.

which they knew or should have known was improperly obtained by defendant Alan Ihne in his capacity as Sullivan's manager of office services. To obtain the relief it seeks, the Commission must make a prima facie showing that the nonpublic information tipped to the Covellos was material, *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976); that the Covellos had acquired, and thereafter violated, a duty to disclose before trading on the material nonpublic information, *Dirks v. SEC*, — U.S. —, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983); and that both Daniel and James Covello "acted with scienter." *Aaron v. SEC*, 446 U.S. 680, 700–701, 100 S.Ct. 1945, 1957–1958, 64 L.Ed.2d 611 (1980); *Dirks, supra*, 103 S.Ct. at 3264 n. 19 (1983).

A useful starting point in characterizing the various relationships and obligations involved in these transactions is the Supreme Court's recent decision in *Dirks, supra*, wherein the Court had occasion to address and further refine the scope of tippee liability under Rule 10b–5. To best understand *Dirks*, however, a brief digression into the sometimes less-than-seamless judicial pronouncements in the area of insider trading is useful. The SEC in *In re Cady, Roberts & Co.*, 40 S.E.C. 907 (1961), first articulated what has come to be known as the "disclose-or-abstain" rule in 10b–5 litigation. The rule is premised on two factors which the Supreme Court subsequently embraced in *Chiarella v. United States*, 445 U.S. 222, 227, 100 S.Ct. 1108, 1114, 63 L.Ed.2d 348 (1979):

"(i) the existence of a relationship affording access to inside information intended to be available only for a corporate purpose, and (ii) the unfairness of allowing a corporate insider to take advantage of that information by trading without disclosure."

The *Chiarella* Court explicitly rejected, however, the notion that parity of information among all market participants is the rationale underlying § 10(b), *id.* at 233, 100 S.Ct. at 1117, and that mere possession of nonpublic material information gives rise to a duty to disclose. Rather, such a duty is grounded in "a relationship of trust and confidence between parties to a transaction." *Id.* at 230, 100 S.Ct. at 1115. The defendant in *Chiarella* was an employee of a financial printing firm commonly retained by companies contemplating tender offers to produce the requisite materials for filing with the SEC. Chiarella made use of confidential information regarding impending tender offers to trade, not in the stocks of his employer's clients (the acquiring corporations), but in the stocks of the target companies. Because he was "a complete stranger" to sellers of the target company's securities, *id.* at 233, 100 S.Ct. at 1117, and had no "relationship of trust and confidence" with them, the Court ruled that the fiduciary duty requisite to imposition of liability under § 10(b) was absent.

In *Dirks, supra*, the Supreme Court again rejected the notion of a general duty on the part of all market participants to forego transactions based on material, nonpublic information and reiterated "the requirement of a specific relationship between the shareholders and the individual trading on inside information...." *Id.* 103 S.Ct. at 3261. This predicate to liability, the Court observed, created certain analytical tensions for the SEC with respect to tippees who trade on inside information. Unlike the typical insider, a tippee generally has no such fiduciary relationship to a corporation or its shareholders. Accordingly, the Court explicitly delineated the circumstances under which a "ban on tippee trading" attaches. *Id.* at 3263. Consonant with the view that a fiduciary relationship is central to the liability rationale of § 10(b), the tippee's duty to disclose or abstain from trading is "derivative from that of the insider's duty." *Id.* at 3264. As stated in *Dirks:*

"Thus, some tippees must assume an insider's duty to the shareholders not because they receive inside information, but rather because it has been made available to them *improperly*. And for Rule 10b–5 purposes, the insider's disclosure is improper only where it would violate his *Cady, Roberts* duty. Thus, a

tippee assumes a fiduciary duty to the shareholders of a corporation not to trade on material nonpublic information only when the insider has breached his fiduciary duty to the shareholders by disclosing the information to the tippee and the tippee knows or should know that there has been a breach." *Id.*

■ Simply put, tippee liability requires a fiduciary breach on the part of the insider/tipper—in this case, Ihne—coupled with the tippee's knowledge that the information subsequently passed along was improperly disclosed. In a footnote to its opinion, the Court made an observation important to this proceeding:

"Under certain circumstances, such as where corporate information is revealed legitimately to an underwriter, accountant, lawyer, or consultant working for the corporation, these outsiders may become fiduciaries of the shareholders. The basis for recognizing this fiduciary duty is not simply that such persons acquired nonpublic corporate information, but rather that they have entered into a special confidential relationship in the conduct of the business of the enterprise and are given access to information solely for corporate purposes.... When such a person breaches his fiduciary relationship, he may be treated more properly as a tipper than a tippee.... For such a duty to be imposed, however, the corporation must expect the outsider to keep the disclosed nonpublic information confidential, and the relationship at least must imply such a duty." (citations omitted).

*Dirks, supra,* 103 S.Ct. at 3261 n. 14.

The Commission suggests that Alan Ihne acquired a "fiduciary duty" in two ways.

Because only one of the theories asserted has merit, it is important to distinguish between them. The first, derived from *Chiarella* and footnote 14 of *Dirks,* suggests that by virtue of his position as a Sullivan employee, Ihne "acquired a fiduciary duty to the shareholders of the corporations." (Pl.Mem. at 12). What the Commission fails to address is the critical distinction between shareholders of the corporations from which the nonpublic information emanated and shareholders of the corporations in which defendants traded.

The rather anomalous result of the Supreme Court's holding in *Chiarella, supra,* at least from a policy perspective, is that an individual who obtains nonpublic information regarding a tender offer from the acquiring company, rather than from the target company, is not subject to liability— at least under the *Chiarella* rationale—if he or she chooses to capitalize on this information by trading in the target company's securities. This, of course, is the position the defendants Covello now urge upon the Court. Noting that none of the transactions from which the Covellos profited involved shares of Sullivan's clients,[8] defendant James Covello[9] argues that Ihne "owed no duty to the sellers of shares in which James Covello traded." (Def.Mem. in Opp. at 5). In support of this argument, defendants contend that Justice Powell's statement regarding Chiarella—"He was not their agent, he was not a fiduciary, he was not a person in whom the sellers had placed their trust and confidence," *id.* 445 U.S. at 232, 100 S.Ct. at 1117—is equally applicable to Ihne.

While troubling,[10] I think the distinction made in *Chiarella* is inescapable and appli-

---

**8.** The only profitable Covello transactions uncovered by the Commission to date involve purchases of Marathon Oil and MAPCO, and Steiger securities. With respect to the Marathon tender offer, Sullivan represented Merrill Lynch and its client the Mobil Corporation. Similarly, Sullivan represented Peter Kiewit Sons, Inc.—not MAPCO—in connection with Kiewit's acquisition of MAPCO stock, and Klockner, Humboldt & Deutz in connection with that company's proposed acquisition of Steiger securities.

**9.** Defendant Daniel Covello joins in the arguments made by his brother James Covello. (Def. D. Covello's Mem. in Opp. at 1, n. 1).

**10.** As one commentator recently stated:

"It is difficult to discern any policy justification for resting the determination as to whether a securities fraud has been committed on the source of the non-public information. Regardless of how he received the information ..., public investors are equally in need of

cable to the facts of this case. Under *Chiarella,* the Covellos' liability is dependent initially on a finding that Ihne, the alleged tipper, can be properly characterized as owing and breaching a fiduciary duty to the shareholders and corporations whose securities were traded. This is simply not the case. The Commission's overbroad assertion that Ihne "acquired a fiduciary duty to the shareholders of the corporations" fails to match the transactions made with the duty owed. In short, the Commission appears to read *Chiarella* and *Dirks* as embracing a theory of "free-floating fiduciary duty," the only requirement being a fact pattern that happens to include a species of fiduciary breach. Neither case supports this conclusion.

This is not, however, the end of the inquiry. The Commission also contends that Ihne owed a fiduciary "duty of silence" to Sullivan and its corporate clients (Pl.Mem. at 13), an argument that does have merit. In *Chiarella,* the Court alluded to, but did not decide, whether an alternative basis for 10b–5 liability might be found in the fiduciary duty owed to an acquiring corporation by virtue of one's position as an employee of a company retained by that corporation. Because "[t]he jury was not instructed on the nature or elements of a duty owed ... to anyone other than the sellers," *id.* at 236, 100 S.Ct. at 1118, the Court did not go on to consider whether Chiarella might

have been liable under Rule 10b–5 for defrauding the prospective acquirors, the printing firm's clients.[11] Such conduct is more properly characterized, and best understood, as a misappropriation of confidential information rather than as fraudulent nondisclosure.

In *United States v. Newman,* 664 F.2d 12 (2d Cir.1981), *cert. denied,* — U.S. ——, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983), the Court of Appeals for this Circuit decided the issue left open in *Chiarella* in the affirmative. *See also O'Connor & Associates v. Dean Witter Reynolds, Inc.,* 529 F.Supp. 1179, 1185 (S.D.N.Y.1981). The defendant in *Newman,* a securities trader for a New York brokerage firm, obtained material nonpublic information regarding planned mergers and acquisitions from two employees of separate investment banking firms. By virtue of their positions, these employees had access to advance information regarding planned takeover bids by clients of their employers. Relying on the information passed along by his confederates, Newman arranged stock purchases in the various target corporations prior to the announcement of the planned acquisitions and the concomitant rise in the market price of these securities. Newman and his conspirators were indicted for securities laws violations and for mail fraud. In an opinion evaluating the legal sufficiency of the indictment, a divided pan-

---

protection. Furthermore, there is nothing in the language of section 10(b) or Rule 10b–5 that suggests such a distinction."

Poser, "Misuse of Confidential Information Concerning a Tender Offer as a Securities Fraud," 49 *Brooklyn L.Rev.* 1265, 1270 (1983).

**11.** In a concurring opinion, Justice Stevens observed as follows:

"The Court correctly does not address ... whether the petitioner's breach of his duty of silence—a duty he unquestionably owed to his employer and to his employer's customers—could give rise to criminal liability under Rule 10b–5. Respectable arguments could be made in support of either position. On the one hand, if we assume that petitioner breached a duty to the acquiring companies that had entrusted confidential information to his employers, a legitimate argument could be made that his actions constituted 'a fraud or a de-

ceit' upon those companies 'in connection with the purchase or sale of any security.' On the other hand, inasmuch as those companies would not be able to recover damages from petitioner for violating Rule 10b–5 because they were neither purchasers nor sellers of target company securities, see *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539, it could also be argued that no actionable violation of Rule 10b–5 had occurred. I think the Court wisely leaves the resolution of this issue for another day.

"I write simply to emphasize the fact that we have not necessarily placed any stamp of approval on what this petitioner did, nor have we held that similar actions must be considered lawful in the future. Rather, we have merely held that petitioner's criminal conviction cannot rest on the theory that he breached a duty he did not owe."

el of the Second Circuit held that, because the investment bank employees' alleged misappropriation of confidential information constituted the requisite element of fraud and was "in connection with" the purchase or sale of a security, a 10b–5 violation was alleged. The Court observed that "[b]y sullying the reputations of [their] employers as safe repositories of client confidences, appellee and his cohorts defrauded their employers as surely as if they took their money." *Id.* at 17. Moreover, Newman and his cohorts wronged the corporate clients of the investment banking firms, "whose takeover plans were keyed to target company stock prices fixed by market forces, not artificially inflated through purchases by purloiners of confidential information." *Id.* Invoking the flexible " 'touching' the sale of securities" test set forth by the Supreme Court in *Superintendent of Insurance v. Bankers Life & Casualty Co.*, 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971), to construe 10b–5's "in connection with" requirement, the Second Circuit went on to state:

> "[S]ince appellee's sole purpose in participating in the misappropriation of confidential takeover information was to purchase shares of the target companies, we find little merit in his disavowal of a connection between the fraud and the purchase."

*Newman, supra,* 664 F.2d at 18.

In *O'Connor & Associates v. Dean Witter Reynolds,* 529 F.Supp. 1179 (S.D.N.Y. 1981), Judge Lasker applied the principles articulated in *Newman* to hold that, although the defendant insiders in *O'Conner* and their tippees owed no fiduciary duty directly to plaintiff,

> "[T]heir argument that the securities laws are not violated by insider (and tippee) trading on the basis of material, nonpublic information unless the insider (the tippee) owes a fiduciary duty to those with whom he trades has been undercut by the Court of Appeals recent decision in *United States v. Newman.*"

*Id.* at 1185.

Similarly, Judge Brieant recently concluded that an employee of a financial printer violated the securities laws when he traded on the basis of confidential information gleaned by examining initial offering materials submitted to the printer, Bowne, by its clients. The Court noted as follows:

> "[T]here was an expectation on the part of Bowne's customers that the information contained within the proofs or the fact that such an offer to purchase was to be made, would be kept confidential, not only by Bowne but by ... lawyers and other participants to whom copies of the proofs would come in the ordinary course of business before the information was released to the public.
>
> "And there was also an expectation ... that no Bowne employee and nobody else coming into contact with this nonpublic information would use it for personal gain or reveal it to others....
>
> "The Court finds that the defendant, Mr. Anthony Materia, owed a fiduciary duty to Bowne and to its clients based on his common law duty to his employer which is known or presumed to be known to everyone in every kind of employment...."

*SEC v. Materia,* No. 82–6225, Tr. of oral decision at 3–4 (S.D.N.Y. Dec. 5, 1983).

■ From *Newman, O'Conner,* and *Materia,* the general principle emerges that Rule 10b–5 liability may be imposed on those who trade on the basis of material nonpublic information tainted by the breach of an insider's fiduciary duty, regardless of whether that duty runs to the sellers of the securities involved. By endorsing the alternative "misappropriation" theory of Rule 10b–5 liability, *Newman, supra,* 664 F.2d at 17, the Second Circuit gave legal effect to the commonsensical view that trading on the basis of improperly obtained information is fundamentally unfair, and that distinctions premised on the source of the information undermine the prophylactic intent of the securities laws.

■ Applying the *Newman* analysis to the case presently before me, I conclude

that Alan Ihne owed a fiduciary duty to Sullivan & Cromwell and its clients not to trade on the basis of misappropriated market information, a duty inherited by any tippees who knew or should have known that the information was improperly obtained. Although Ihne was not the classic corporate "insider," the Supreme Court made clear in *Dirks, supra,* that outsiders may become corporate fiduciaries, or "temporary insiders," when they "have entered into a special confidential relationship" with the corporation and "are given access to information solely for corporate purposes." *Id.* 103 S.Ct. at 3261 n. 14. Simply put, *Dirks* gives Supreme Court imprimatur to the notion that outsiders, under certain defined circumstances, may become insiders with corollary fiduciary obligations, while *Newman* and its progeny demonstrate that such a position of trust gives rise to a general duty to abstain under § 10(b) and Rule 10b–5 from making use of this information in pursuit of "secret profits." *Dirks,* 103 S.Ct. at 3261.[12] Even if Ihne and his tippees owed no fiduciary duty to the persons with whom they traded, nevertheless, "under the *Newman* rationale, because their trading or tipping breached fiduciary duties owed to other parties, the alleged conduct constituted a fraudulent practice within the meaning of the securities laws." *O'Conner, supra,* 529 F.Supp. at 1185.

■ Defendants seek to skirt the impact of *Newman* and *Dirks* by asserting that there is no proof Ihne was aware of the "special confidential relationship," *Dirks,* 103 S.Ct. at 3261 n. 14, between the law firm and its clients, absent which a clerical employee should be exempt from the fiduciary obligation articulated in those opinions. (Def.Mem. in Opp. at 7). I would first make the general observation that all law firms, especially those such as Sullivan & Cromwell that routinely handle sensitive matters, impress upon their incoming employees the firm's expectation that they will not publicly discuss matters pertaining to clients. The Commission elicited no testimony to this effect, but I take judicial notice of it. Rule 201(b), F.R.Evid., defines a judicially noticed fact as one "not subject to reasonable dispute in that it is ... generally known within the territorial jurisdiction of the trial court...." I have not been so long removed from the world inhabited by firms like Sullivan to have forgotten what life is like there.

■ Further, Alan Robert Ihne was not a low-level clerical employee at Sullivan but the manager of office services for the firm, a position of substantial responsibility. The testimony of two service department employees at Sullivan, subordinates of Ihne, indicates their awareness that, on more than one occasion, they were privy to non-public information regarding the identity of tender offer target companies. (Tr. at 97, 105–107). Bruce Arch testified that he never revealed this information to anyone outside the law firm. (Tr. 107). In addition, documents relating to the companies involved in a planned tender offer are identified with code names within the firm (Tr. at 57)—certainly an indicia of confidentiality—and employees of the office services department handle such documents. *Cf. SEC v. Materia, supra,* Tr. at 6 (the fact that identifying information was blanked out on printer's proofs of offer-to-purchase document would make it "readily apparent ... that this material was regarded as confidential and was not to be revealed to others or used for private profit"). From these various factors I infer that Sullivan's office services employees,

---

12. In *O'Connor, supra,* 529 F.Supp. at 1187, Judge Lasker articulated this distinction as follows:

"[B]y virtue of their *fiduciary* duty to the corporation and its shareholders, corporate insiders become subject to the *separate* duty to either 'abstain or disclose.' Unlike the fiduciary duty, which is owed only to the corporation and its shareholders, this additional duty to disclose is owed 'to the investing public ..., to those investors trading contemporaneously with the insider....'

"Thus, by virtue of the corporate insiders' duties to the corporation, they, and by derivation their tippees, indirectly came under a duty ... to 'abstain or disclose' if they possess material nonpublic information." (citations omitted).

including their manager Alan Ihne, were fully aware of the confidential nature of the relationship between their employer and the firm's corporate clients.

I am also satisfied that sufficient evidence has been presented to support, at this preliminary stage, the inference that Ihne had access to the information allegedly tipped to the Covellos. While the record could be more complete as to Ihne's specific duties at Sullivan, a clear deficiency in the Commission's presentation, the application before the Court is for a preliminary, rather than permanent injunction, where relief "is customarily granted on the basis of ... evidence that is less complete than in a trial on the merits." *University of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1980). Evidence has been presented that documents, such as the annual report of a company targeted in a planned tender offer, are routinely obtained by the firm in connection with its legal services, that the names of the companies involved in the proposed transaction are given code names, and that when these company documents are sent for photocopying prior to being circulated within the firm, the charge slip indicates the code name being used. (Tr. 57–58). In short, at that point, a target company's true identity is revealed on the documents to be copied, while its corresponding code name appears on a billing slip attached.

In addition, one of the duties of office services department employees is, according to the testimony of John Monahan, to "make filings at the SEC on behalf of the lawyers, and we do see the documents before we take them down to Washington." (Tr. at 97). That, in fact, is how Monahan learned on more than one occasion the name of a company targeted in a tender offer several days in advance of a public announcement. *Id.* Both employees in Ihne's department also testified that, as part of their job, they personally distribute memoranda to attorneys in the firm. In connection with that duty, they have on hand in the department, or are given, a list of attorneys' names from which it is possible to determine which specific members of

the firm "work on tender offers and takeovers." (Tr. at 106). Arch testified further that, in performing his duties as service clerk, he had become familiar with the identity and whereabouts of attorneys in "the takeover group." (Tr. 106). I conclude from the evidence presented that several alternative means of collecting information regarding proposed corporate acquisitions are available to members of the office services department, and that two employees have, in fact, acquired such information. As manager of the department, Alan Ihne had equal or better access to similar information. Access to information regarding the specific securities traded by the Covellos can be inferred from proof of general access coupled with other evidence yet to be addressed in this decision. As stated by Judge Brieant in *SEC v. Materia, supra*, Tr. at 19:

> "Neither the Court nor the defendant can isolate particular issues and just chop away at them. We have to look at the totality of the case ... to find that these purchases constituted trading immediately following access, and on the basis of access, to inside information acquired ... in the course of employment."

With this counsel in mind, I turn to a brief review of the proof offered by the Commission and the inferences as to actual disclosure and scienter that naturally and compellingly flow therefrom. The evidence on the record before the Court has been set forth in detail in Part II of this Opinion, *supra*.

During the entire period at issue in this proceeding, in the Covello brokerage accounts that have surfaced to date (at Dean Witter, Paine Webber, and Josephthal), the Covellos purchased only securities of companies involved in matters for which Sullivan & Cromwell had been retained to provide legal services. This is true despite the fact that the Covellos are bond traders presumably exposed on a daily basis to numerous potential market op-

portunities. Yet the only opportunities they seized, and with a remarkable degree of confidence as demonstrated by the thousands of dollars they were willing to invest, were purchases related to as yet undisclosed merger or acquisition transactions which in some way involved Alan Ihne's law firm.

Alan Ihne and James Covello have been close friends for many years, and James Covello has become friendly with other employees in Sullivan's office services department through his relationship with Ihne. On many occasions Covello has entertained these individuals in his home and on his boat. Ihne is also a drinking partner of James Stivaletti, an individual known to be acquainted with various members of the Musella group. All four of the securities purchased by one or both Covellos were also purchased, on the same day or shortly thereafter, by members of the Musella group. The Musella group has also invested thousands of dollars in other securities with a demonstrable link to the Sullivan & Cromwell firm. With respect to one of these securities, Signode, the Musella group commenced its purchase of well over a million dollars of Signode stock on the same morning that Stivaletti spoke to Ihne on the telephone from Hong Kong, and immediately thereafter placed a call to Dominick Musella.

Within three weeks, Signode announced publicly the previously secret information of a leveraged buy-out of its stock. Similarly, with respect to two of the trades made by the Covellos—Marathon and MAPCO—public announcements having a significant market impact on the value of the securities were made within days of the Covellos' purchases. Although no such an-

nouncements occurred in connection with Tesoro and Steiger, in each instance a proposal with a similar expected effect on the value of the securities was under consideration, and Sullivan & Cromwell was privy to those plans.

The evidence offered, like pieces to a puzzle, takes on significance only when one attempts to arrange the individual proof into some coherent, larger picture. Although gaps remain to be sure, I can suggest no more credible explanation for the picture that emerges than the fact that Alan Ihne was tipping to James Covello nonpublic material information gathered during the course of his employment at Sullivan & Cromwell and that the disclosures prompted the Covellos to purchase the securities they did at the times that they did. I draw this conclusion from the timing of the Covellos' trades, both with respect to the Musella group's parallel periods of trading and the imminence of significant public announcements; the Covellos' exclusive trading in securities somehow linked to Sullivan & Cromwell and of companies secretly slated to be the focus of intense market attention; the substantial amounts of money invested by the Covellos on the rare occasions when they entered the market; James Covello's intimate relationship with Ihne and Ihne's relationship, in turn, with Stivaletti and, indirectly, the Musella group; the congruence of the Ihne-Stivaletti,[13] Stivaletti-Musella phone calls from Hong Kong and the Musella group's sudden burst of intense trading in Signode securities; and the remarkable overlap and seeming orchestration of the Covello and Musella group trades. Any innocent explanation incorporating the proof offered is less plausible than an inference of wrong-

13. Although James Stivaletti stated during his December 2, 1983 deposition that he called Ihne from Hong Kong to "thank him for driving me to the airport" (Dep. at 65), I find this explanation difficult to credit given that the call was charged to Ihne's telephone number, occurred almost a week after Stivaletti's arrival, and was placed at an unusual hour for a thank you call—12:45 a.m. New York time. Stivaletti's lack of credibility became more apparent at the December 8, 1983 hearing, where I observed

him to be a grudging and uncooperative witness whose responses generally took the form "I don't remember"; "Might have"; or "Could be." With respect to the telephone call to Ihne, Stivaletti initially testified at the hearing that he was too drunk at the time to remember whom he called (Tr. at 64). When confronted with his deposition testimony of a week earlier, however, he admitted that he had, in fact, placed a call to Ihne from the Hotel Singapore. (Tr. at 65–66).

doing, and I can only draw an adverse conclusion from the Covellos' invocation of the Fifth Amendment privilege and consequent refusal to provide the Court with an alternative version of their allegedly blameless activities.

I also have no difficulty in inferring from the proof presented that James Covello knew or should have known that the information he received from Ihne was improperly obtained and disclosed by Ihne.

As stated by the Supreme Court:

"[T]he proof of scienter required in fraud cases is often a matter of inference from circumstantial evidence. If anything, the difficulty of proving the defendant's state of mind supports a lower standard of proof [than a preponderance of the evidence]. In any event, we have noted elsewhere that circumstantial evidence can be more than sufficient."

*Herman & MacLean v. Huddleston, supra*, 103 S.Ct. 683, 692 n. 30 (1983).

James Covello is a corporate bond trader with a New York brokerage house. He is a professional navigator in the sometimes murky and turbulent waters of corporate finance. He is not a stranger to the manner in which deals are structured: the objectives of an acquiring corporation, the desires, fears or strategies of its target, the support troops they summon to their aid, the overarching need for secrecy before public disclosure. Covello had to know that law firms must as a matter of policy forbid their employees from disclosing material, nonpublic information to outsiders concerning their clients' affairs. Ihne was not a fellow broker, an analyst, a publisher of an investment newsletter, or some other legitimate source of market information. Cf. *Dirks*, 103 S.Ct. 3263 ("Imposing a duty to disclose or abstain solely because a person knowingly receives material nonpublic information from an insider and trades on it could have an inhibiting influence on the role of market analysts, which the SEC itself recognizes is necessary to the preservation of a healthy market."). Ihne held a responsible clerical position at a law firm whose duty of confidentiality to its clients is familiar to anyone with any knowledge of how corporate business is done. James Covello could only regard Ihne as a trafficker in stolen goods.

Daniel Covello argues, however, that if he merely "received stock tips from his brother, he had no reason to know that the information came improperly from an insider." (Def.Mem. in Opp. at 8). While the conclusion that Daniel Covello acted with scienter is somewhat more conjectural, the inference is a proper one. This is not an instance, as in *SEC v. Materia, supra*, tr. at 17, where an unsophisticated individual unschooled in market transactions blindly follows the advice of a person known to be a knowledgeable trader. Under those circumstances, Judge Brieant concluded that a wife's unquestioning adherence to her husband's market advice did not establish the requisite scienter on her part. Daniel Covello was as sophisticated a market professional as his brother, and I find it highly improbable that he would invest large sums of money on three occasions in various securities without ascertaining the source, reliability, and underlying circumstances of the tip received. Even assuming he was initially in the dark, certainly the announcement of the Mobil-Marathon tender offer immediately after his purchase of Marathon call options should have led him to question the "fortuity" of his timing before taking advantage of further brotherly stock tips. In addition, both Daniel Covello and James Covello traded in Steiger securities, an extremely thinly traded stock during that period. This would be an unusual investment decision for one operating without benefit of inside information, and therefore the kind of tip that Daniel Covello presumably would question. The depiction of Daniel Covello as the innocent, unquestioning, and somewhat dim-witted recipient of his conniving brother's stock tips is less than persuasive.

Accordingly I infer that Daniel Covello either knew or should have known that he was trading on improperly obtained nonpublic information. This conclusion is bolstered by the Commission's recent dis-

covery that, on January 18, 1982, the Covellos went together to open individual brokerage accounts at the Long Island branch of Josephthal & Co., Inc., and that on the following day James Covello used his account to purchase MAPCO call options, a Sullivan-connected corporation. (Pl.Supp. Mem. at 2–3). Both Daniel and James Covello already had accounts at Dean Witter Reynolds, where Daniel Covello was employed. Accordingly, the decision to open new accounts at a brokerage firm with which they had no connection, coupled with James Covello's immediate use of his account to trade in MAPCO securities, strongly suggests a desire to distribute their improper trades among several accounts.[14] While Daniel Covello may have an explanation for his decision to open the Josephthal account, I draw an adverse inference from his invocation of the Fifth Amendment in response to questions regarding the existence of brokerage accounts other than his Dean Witter account and about other trades made during the period in question.

Finally, there is no question that the information allegedly tipped to the Covellos by Alan Ihne was material, in the sense that there is "a substantial likelihood that the disclosure of the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). With respect to tender offers specifically, Judge Brieant stated in *SEC v. Materia, supra,* as follows:

> "It is generally understood that offers to purchase in the nature of tenders are generally set at a price higher than the current market price at the time that the offer is made and the fact that a tender offer was planned would carry with it an inference on the part of anyone receiving such knowledge that the offering price would be higher than the closing market price on the day the offer was made.

And the fact, therefore, that a tender offer is planned as to a particular target corporation would, without more, be material information...."

I conclude that the Commission has established a strong prima facie case of § 10(b) and Rule 10b–5 violations on the part of both Daniel and James Covello.

*§ 14(e) and Rule 14e–3*

Section 14(e), a provision forming part of the Williams Act, provides in pertinent part that "[i]t shall be unlawful for any person ... to engage in any fraudulent, deceptive, or manipulative acts or practices ... in connection with any tender offer." Rule 14e–3, promulgated thereunder, prohibits trading on the basis of material, nonpublic information by any person who knows or should know that the information is confidential and was acquired, directly or indirectly, from the acquiring or target corporation, or any person acting on their behalf. The obligation to abstain takes effect when "a substantial step or steps to commence ... a tender offer" have been taken. Notably, the Williams Act does not require the *Chiarella* element of fiduciary breach between parties to the improper trade. Rather, "the statutory language ... is open-ended as to the transactions which might be covered...." *O'Connor, supra,* 529 F.Supp. at 1191.

Having already found the Commission's showing adequate with respect to the Covellos' trading on the basis of nonpublic, material information, which they knew or should have known was confidential and improperly obtained, I need not reiterate those conclusions here. Given that the Covellos bought Marathon and Tesoro securities during a period when "substantial steps" had been taken to commence tender offers for those companies, on the basis of information obtained from the law firm acting on behalf of the acquiring companies, the Commission has also established a pri-

---

**14.** Further support for this view is found in the Commission's January 16, 1984, supplementation of the record. Records subpoenaed from Paine Webber, Jackson & Curtis reveal that James Covello purchased his Steiger shares in yet a third brokerage account.

**444**

ma facie case of § 14(e) and Rule 14e–3 violations.

*Likelihood of Future Violations*

Before a preliminary injunction may issue, the Commission must also establish the likelihood of future violations of the securities laws. In denying the Commission's request for a temporary restraining order, I expressed my view that the identification of defendant Alan Ihne, the alleged tipper at Sullivan & Cromwell, and his subsequent leave of absence from the firm, placed the case on a significantly different footing than than when the existence and identity of the purported insider at Sullivan was merely speculative. (Mem.Op. of Nov. 22, 1983, at 2). As stated then, "[T]he identification and neutralizing of defendant Ihne, who in the SEC's view was the insider essential to the scheme, surely reduces the likelihood of this particular scheme continuing to operate." *Id.* at 2–3. The Commission now urges me to modify this view after a consideration of the various factors held to be pertinent to a "reasonable likelihood" determination.

■ As stated by the Court of Appeals for this Circuit, "Whether the inference that the defendant is likely to repeat the wrong is properly drawn ... depends on the totality of circumstances...." *SEC v. Management Dynamics, Inc., supra,* 515 F.2d at 807. The fact that a defendant is currently complying with the securities laws, absent other indicia of non-recurrence, does not preclude the issuance of an injunction. *SEC v. Murphy,* 626 F.2d 633, 655 (9th Cir.1980); *SEC v. Manor Nursing Centers,* 458 F.2d 1082, 1101 (2d Cir.1975). Among the factors to be considered are whether the infraction was an isolated occurrence, the degree of scienter involved, whether defendant acknowledges his past conduct and evinces some degree of remorse, and whether, "because of his professional occupation, the defendant might be in a position where future violations could be anticipated." *SEC v. Commonwealth Chemical Securities, Inc.,* 574 F.2d 90, 100 (2d Cir.1978).

I have already found, with respect to both Daniel and James Covello, a prima facie showing of § 10(b) and § 14(e) violations. Further, the purchases of Marathon, Tesoro, Steiger, and MAPCO securities were carried out over a substantial period of time, involved substantial sums of money, and were undertaken by sophisticated securities professionals with the knowledge and acumen to recognize the nature of their activities. The setting up and use of various trading accounts suggests an effort at concealment. In short, this is not an "isolated occurrence," a situation where defendants "simply saw an opportunity and took it." *SEC v. Lund,* 570 F.Supp. 1397, 1404 (C.D.Cal.1983). Defendants' connection with Ihne, the involvement of Sullivan & Cromwell in every trade—and indeed the only known trades—undertaken during the period in question, and the amounts of money invested belie any characterization of their conduct as an unwitting and now much-regretted fall from grace. *Compare SEC v. Bausch & Lomb, Inc.,* 565 F.2d 8, 18–19 (2d Cir.1977) (injunction not warranted where defendant, "a sincere and honest man ..., in an agitated moment, temporarily abandoned his usual caution and allowed material inside information to 'pop out.'"). Indeed, neither defendant has expressed any remorse or admitted that his acts were in any sense blameworthy. *Compare Bausch & Lomb,* 565 F.2d at 19 ("it is highly unlikely" that violation will recur where defendant was "terribly upset by his error, and candidly expressed this.").

In addition, as corporate bond traders whose livelihood is dependent on an ongoing involvement in the market, the Covellos may again face temptation of this sort and are in a better position than most to capitalize on improperly disclosed information. *See SEC v. Shapiro,* 494 F.2d 1301, 1308 (2d Cir.1974) (where "the same circumstances ..., with the same enticements may well crop up again," the "admonition of an injunction to obey the law" is appropriate). It is not sufficient to argue that the Covellos would be foolhardy to violate the securities laws in the midst of an SEC

445

enforcement proceeding. As the cases make clear, the inquiry goes to predilection rather than immediate probability, *SEC v. Dimensional Entertainment*, 518 F.Supp. 773, 775 (S.D.N.Y.1981) (injunction entered even though defendant would not be released from prison for at least a year), and a court should not be obligated to assess, or even to take into account, the SEC's degree of vigilance in policing particular individuals before an injunction may issue.

Accordingly, the Commission's application for a preliminary injunction against defendants Daniel and James Covello is granted.

## IV.

*The Asset Freeze*

The Commission's request for an order freezing the profits made by Daniel and James Covello in connection with their purchases of Marathon and MAPCO securities, as well as a freeze on profits made on trades in any of the securities at issue in this proceeding, is granted. Such an order is appropriate, pending a trial on the merits, to ensure that any illegally obtained profits will remain available to satisfy a potential future order of disgorgement. *SEC v. Manor Nursing*, 458 F.2d 1082, 1105–06 (2d Cir.1972).

## V.

*Conclusion*

For the reasons stated, plaintiff's motion for a preliminary injunction barring Daniel and James Covello from future violations of § 10(b) and § 14(e) of the Securities Exchange Act of 1934, and Rules 10b–5 and 14e–3 promulgated thereunder, and for a temporary freeze of any profits made by the Covellos on trades in any of the securities at issue in this proceeding, is granted.

Counsel for the Commission is directed to submit to the Court on five (5) days' notice a proposed order in accordance with this Opinion.

It is SO ORDERED.