### SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

**Dominick MUSELLA, Albert J. Deangelis, Anthony Brunetti, Thomas Dispigno, Richard I. Rosenkranz, John Musella, Vito Rossini, Edward O'Neill, and Richard B. Martin, Defendants.**

### No. 83 CV 342 (KMW).

United States District Court,
S.D. New York.

Aug. 8, 1989.

KIMBA M. WOOD, District Judge.

This is an insider trading case brought by the Securities and Exchange Commission (the "SEC") against several individuals who allegedly purchased securities based on information stolen from the law firm of Sullivan & Cromwell. A former Sullivan & Cromwell employee and his stock broker, who participated in these illegal activities, pleaded guilty to criminal charges of insider trading and served time in prison; other participants either lost or settled civil claims resulting in disgorgement of profits and injunctions against future trading.[1] The SEC now complains that the sole defendant remaining in this case, Albert DeAngelis, knowingly purchased securities in three companies based on material, nonpublic information stolen from Sullivan & Cromwell. Following a three day bench trial, the Court finds that defendant violated the federal securities laws.

## I. FINDINGS OF FACT

The following are the Court's findings of fact. The primary tipper in this insider trading scheme was Alan R. Ihne, formerly the manager of the office services department at Sullivan & Cromwell, a New York law firm. Stipulated Fact ("SF") 1. Between January 1, 1981 and December 31, 1982, the period in which the trades at issue in this suit occurred, Sullivan & Cromwell rendered confidential legal advice to certain clients concerning proposed and anticipated tender offers, mergers, and leveraged buyouts. Sullivan & Cromwell distributed to every employee, including Ihne, a series of memoranda concerning the importance of safeguarding confidential information, and Ihne was aware of the firm's policy. SF 2.

Ihne admits that he knowingly and willfully misappropriated confidential information from Sullivan & Cromwell about corporate mergers and acquisitions involving Sullivan & Cromwell clients. SF 3; Trial Transcript ("Tr.") at 36. Moreover, Ihne testified that he knew what he was doing

Richard J. Sheehan, Delane Cox, Brad Bennett, U.S. S.E.C., Washington, D.C., for plaintiff.

William Lupo and Jane Falcon, Brooklyn, N.Y., for defendants.

1. *See United States v. Ihne et al.,* S 84 Cr. 686 (CLB); *S.E.C. v. Musella, et al.,* 578 F.Supp. 425 (S.D.N.Y.1984) (Haight, J.); *S.E.C. v. Musella, et al.,* 678 F.Supp. 1060 (S.D.N.Y.1988) (Haight, J.); *S.E.C. v. Musella, et al.,* 83 CV 342 (KMW), Judgment dated December 9, 1988.

was wrong but that he nonetheless made a "conscious decision" to steal the information. Tr. at 36; SF 3.

Ihne supplied the misappropriated information both to a friend, Joseph Palomba, and to Palomba's stockbroker, James Stivaletti. SF 4. Ihne, Palomba and Stivaletti subsequently formed a three man scheme to profit from the confidential information that Ihne misappropriated from Sullivan & Cromwell. The group agreed that Ihne would steal information concerning possible tender offers, mergers, or leveraged buyouts from Sullivan & Cromwell and give the information to Stivaletti who would make their investment decisions. SF 5, 7. In furtherance of this scheme, Ihne, Palomba and Stivaletti purchased call options in Texasgulf, Inc. ("Texasgulf") shortly before a tender offer for Texasgulf shares was announced by Societe Nationale Elf Aquitaine, S.A., a client of Sullivan & Cromwell. SF 5, 6.

After the Texasgulf transaction, Palomba expressed concern over the use of his own account to purchase securities on behalf of the group. Ihne and Palomba asked Stivaletti to find someone to purchase securities on the group's behalf. SF 8. Stivaletti enlisted Dominick Musella, the brother of a college classmate, to purchase securities for the group. Musella and Stivaletti initially agreed that if Stivaletti found another "good opportunity like Texasgulf," Musella would buy the stock, and they would divide the profits evenly. Plaintiff's Exhibit ("PX") 11 [Affidavit of James Stivaletti] at ¶ 8; Tr. at 98–102. Stivaletti advised Musella to spread his trading among different accounts, and if possible, different names. *Id.* at ¶ 14. Stivaletti reported back to Ihne and Palomba that he had located someone willing to purchase stock for them. Stivaletti did not reveal Musella's identity to Ihne and Palomba, referring to him only as "Tom Jones." PX 11 at ¶ 10, 12; Tr. at 104–105.

On August 13, 1981, Musella made the first securities purchase of his life. Based on information Ihne had stolen from Sullivan & Cromwell, Ihne and Stivaletti concluded that there was going to be a tender offer for Garfinckel. SF 9. Stivaletti called Musella and gave him instructions to purchase shares of Garfinckel. Stivaletti Aff. at ¶ 12; Tr. at 99. Upon hearing from Stivaletti, Musella, who did not have a broker, called the Teamsters Union Office in Queens looking for his friend, defendant Albert DeAngelis. DeAngelis was not in, and Musella spoke instead to Richard Stolfi, an official at the union office whom he had met through DeAngelis. Musella asked Stolfi to recommend a broker. Stolfi recommended Gus Drakos at Merrill Lynch. That day, Musella opened through Drakos the first brokerage account he ever had and purchased 4,000 shares of Garfinckel stock for $136,791.37. SF 10. Musella financed the Garfinckel transaction by cashing a $20,000 certificate of deposit, at a penalty, and with $48,000 borrowed from his then 19 year old nephew, Frank Tumminia. Tumminia's funds represented life insurance proceeds that he had recently received from the death of his parents. Musella had never borrowed money from Tumminia before and did not sign any documents guaranteeing his repayment of the loan. SF 11.

The next day, August 14, 1981, a tender offer for Garfinckel was announced by Allied Stores Corporation, a client of Sullivan & Cromwell. Musella sold his shares that same day for $188,358.13, realizing a net profit of $51,566.76. SF 12. Shortly after the Garfinckel transaction, Stivaletti arranged to meet Musella in Musella's Cadillac in front of a diner in Bay Ridge, New York. During the meeting Musella handed Stivaletti an envelope containing approximately $18,000 in cash. Musella asked Stivaletti for the source of his information, but Stivaletti refused to tell him. PX 11 at ¶ 14; Tr. at 101, 107. As a result, Musella began to refer to Stivaletti's source as "The Goose that Laid the Golden Egg." PX 11 at ¶ 10, 11; Tr. at 104–105.

## A. *DeAngelis Purchases Marathon Oil Options*

Stivaletti and Ihne next decided to purchase stock in the Marathon Oil Company ("Marathon") based on information Ihne misappropriated from Sullivan & Cromwell.

SF 18, 19, 23. Stivaletti called Musella and told him to purchase Marathon options. Stivaletti gave Musella specific instructions to purchase call options of a certain series and strike price. PX 11 at ¶ 22; Tr. at 102. Although Musella told Stivaletti he was unable to purchase any Marathon options (PX 11 at ¶ 23, Tr. at 102), on October 29, 1981, Musella bought 200 December 70 and 100 December 80 call option contracts in Marathon Oil for a purchase price of $76,-844.79. Musella sold his options on November 2, 11, and 19, 1981 for a total selling price of $649,339.89, realizing a net profit of $572,495.10. SF 20. Musella never told Stivaletti that he purchased the Marathon options, and he never shared any of the profits with Stivaletti, Palomba, or Ihne. Tr. at 103.

DeAngelis purchased Marathon call options on October 29, 1981, the same day that Musella purchased Marathon call options. DeAngelis called his broker, Lewis Siegel, at 3:45 p.m. on October 29, 1981 and directed him to purchase 120 December 70 Marathon options at the prevailing market price (these options had the same expiration date and strike price as one of the two types of Marathon options purchased by Musella). Siegel told DeAngelis the options would probably cost $30,000 to $40,-000. In fact, the options cost over $64,000. Siegel testified that when he called DeAngelis back to confirm that he had placed the order, DeAngelis had no reaction upon learning that the options had cost nearly double Siegel's earlier estimate. Tr. at 157–159. DeAngelis called Musella at 4:24 p.m. on the day they both purchased the options. PX 12 (New York Telephone Company Records). DeAngelis sold these options on November 4, 6, and 9, 1981 at a net profit of $268,513.86. SF 21.

DeAngelis' purchase of Marathon options on October 29, 1981 was his first securities transaction since April of 1980. His account had been inactive for 19 months. Tr. at 146–147; PX 25 (Monthly Account Statements from Thomson McKinnon Securities). Prior to buying Marathon options, DeAngelis had purchased options on only two other occasions, both times in 1978. PX 25. In order to pay for the Marathon options, DeAngelis borrowed the money from DeAngelis Jewelers—a business in which he had no financial interest. A check from DeAngelis Jewelers was issued to Albert DeAngelis on October 30, 1981 in the amount of $62,801.18. SF 22; Tr. at 205.

DeAngelis testified that he bought Marathon because "I know he [Musella] was buying it, and two, I felt like taking a gamble." Tr. at 243. He testified that he thought he would make money on Marathon because "I had been hearing different conversations about oil stocks, and oil was the game in town at that time." Tr. at 244. DeAngelis further claimed that he was interested in Marathon because he read about the company in "foreign newspapers," and more specifically, in an "Australian publication." *Id.* at 261, 327. DeAngelis did not produce any of these articles at trial. Finally, DeAngelis testified at his deposition that he purchased Marathon because he made money on Penn Central and knew the government would take his profit in taxes if he did not make another purchase. *Id.* at 267.

Musella confirmed that he spoke with DeAngelis about Marathon. Musella testified that "Mr. DeAngelis expressed great interest in also purchasing Marathon options," and that he and DeAngelis agreed that "it was beneficial to buy [Marathon] options rather than common stock." PX 6 at 154.

### B. *DeAngelis Purchases Penn Central*

In late October of 1981, Stivaletti concluded from a document Ihne had taken from Sullivan & Cromwell that a tender offer for Penn Central was imminent. SF 15. Ihne and Stivaletti agreed to contact "Tom Jones" (Musella) to direct a purchase of Penn Central stock. Stivaletti then contacted Musella and directed him to buy Penn Central stock. PX 11 at ¶ 18; Tr. at 106–107.

Musella purchased 9,000 shares of Penn Central on October 22, 1981. He sold these shares on November 5, 1981. SF 16. DeAngelis purchased 1,000 shares of Penn

Central on November 2, 1981 and 2,000 shares on November 3, for a total purchase price of $120,742.44. DeAngelis sold these shares on November 9, 1981 for a profit of $4,661.33. SF 17.

DeAngelis and Musella had several discussions concerning Penn Central before DeAngelis made his purchases. According to Musella, during these conversations "DeAngelis was expressing to me certain feelings that he had in regards to Penn Central and I [Musella] was expressing my feelings and thoughts that I had about Penn Central...." PX 8 (Deposition of Dominick Musella) at 593; *see also* Tr. at 210–211, 233.

DeAngelis testified that he purchased Penn Central, because he did a lot of reading on the company and "thought Penn Central was going to be ... subsidized like the railroads are in Europe ... [and] if they would sell off the land holdings they had [then the stock] would be worth a lot of money." Tr. at 229–230.

C. *DeAngelis Purchases of Signode Corporation*

Ihne also stole confidential information from Sullivan & Cromwell concerning Signode Corporation ("Signode"). Tr. at 52–53; SF 26. In February of 1982, while in Hong Kong on vacation, Stivaletti learned about a takeover involving Signode during a telephone conversation with Palomba. Tr. at 109. Stivaletti called Ihne from Hong Kong on February 9, 1982 at 1:45 a.m. (E.S.T.) to confirm that Signode would be acquired. Stivaletti then called Musella at 2:00 a.m. (E.S.T.) to advise him of the Signode takeover. Stivaletti told Musella not to purchase Signode until he returned from Hong Kong because he wanted to do some research on the company. Musella called Stivaletti back twice that day, at 12:47 p.m. (E.S.T.) (lasting 1 minute) and 12:51 p.m. (E.S.T.) (lasting 8 minutes). After his return from Hong Kong, Stivaletti directed Musella to purchase Signode. Tr. at 109–110; PX 11 at ¶ 26; SF 24.

DeAngelis called Musella on February 9, 1982 at 12:18 p.m. (E.S.T.), 10 hours after Stivaletti had told Musella about the Sig-

node acquisition. The call lasted 19 minutes and 17 seconds. DeAngelis began purchasing Signode that same day, amassing 12,700 shares of Signode between February 9 and February 25, 1982 at a total purchase price of $518,868.33. SF 24, 25.

Musella began purchasing Signode after Stivaletti returned from Hong Kong. Musella purchased 14,000 shares of Signode between February 22 and 25, 1982 for a total purchase price of $664,582.27.

DeAngelis testified that he "definitely ... discussed Signode with Mr. Musella" and that it was he who brought Signode to the attention of Musella. Tr. at 210, 269–270. DeAngelis further testified that he purchased Signode stock because he read an article in a Teamster's booklet about the malfunctioning of strapping materials and believed Signode manufactured a superior product. *Id.* at 210, 269–270. DeAngelis did not produce the Teamster's article at trial.

DeAngelis also testified that he discussed Signode with John Malizia, the son of a close friend. DeAngelis "strongly recommended" Signode to Malizia as "[b]asically a short-term investment ... because ... it was a possible takeover possibility...." Tr. at 419. Malizia was beginning a side business, called Targa Associates, to invest funds for middle-income family members and to provide advice about money market funds. SF 34. Despite having never heard of Signode prior to his conversation with DeAngelis, on February 12, 1982, Malizia (on behalf of Targa Associates) purchased $123,621.43 of Signode stock. The funds were obtained from Malizia's personal assets, as well as from various family members, including parents, uncles and grandparents, whom Malizia told he "had something good." Tr. at 423, 434. Malizia concluded that DeAngelis was getting his information from "people that knew something about what was going on with the particular instruments ... someone that did know what was happening." Malizia did not think this information was available to the general public. Tr. at 419, 421–422.

After Signode announced a leveraged buyout, Stivaletti told Musella to sell his Signode shares. Musella sold the shares between March 1 and 2, 1982, realizing a profit of $95,246.63. DeAngelis sold his stock in Signode between March 1 and 3, 1982 at a profit of $89,617.91. SF 25. After selling his Signode shares, Musella gave Stivaletti $4,500 which Stivaletti split with Ihne and Palomba. Tr. at 111; PX 11 at ¶ 26.

Stivaletti and Ihne both pleaded guilty to criminal charges of insider trading and served time in prison. Palomba pleaded guilty to criminal tax fraud charges relating to his insider trading profits. Tr. at 94; SF 27; PX 26; PX 27. Dominick Musella, originally a defendant in this action, died in a car crash on June 20, 1984. The SEC abandoned efforts to substitute his estate. Joint Pre–Trial Order at 2.

### D. *Musella Knowingly Traded On Stolen Confidential Information*

The Court finds that Musella knew he was receiving stolen, confidential information from Stivaletti. According to Stivaletti, Musella "candidly understood" that the stock information Stivaletti was giving him was based on material, non-public information. Musella "didn't know where [the information was coming from] but he knew it was non-public information." Tr. at 123. Stivaletti further testified that he told Musella that it was confidential information from a source that he would not identify. *Id.* at 132–133. Musella gave the source of his inside information a code name: "The Goose that Laid the Golden Egg." *Id.* at 104–105. After the Garfinckel transaction, Musella asked Stivaletti "if [his] source was good" and whether "there was going to be another takeover deal." PX 11 at ¶ 14. During the same time period, Musella told Stivaletti that if Stivaletti "were able to give him [Musella] a week's notice of a deal, he [Musella] could buy it somewhere else." Stivaletti understood this to mean that Musella could buy stock through an overseas account or in some other place or name. *Id.* at ¶ 19. On one occasion, Musella showed Stivaletti a magazine article about insider trading. The article de-

scribed different sorts of people who could get access to inside information, including lawyers, secretaries and printers. The article also contained a cartoon depicting the various sources of illegally obtained confidential information. Musella pointed to the cartoon and asked Stivaletti which one of the people depicted was Stivaletti's source. Stivaletti told Musella that "it's one of those." Tr. at 108, 124; PX 11 at ¶ 16.

Before he joined the Ihne–Palomba–Stivaletti scheme, Musella had never before purchased securities or had a brokerage account in his life. Moreover, Musella had an extremely limited knowledge of the securities markets. He was described by one witness as incapable of intelligently discussing the stock market. Tr. at 420 (Testimony of John Malizia). Musella also lacked the financial resources necessary to make large securities purchases. In 1979 and 1980, Musella reported income of $6,642 and $4,361, respectively on his tax returns and stated that he was a beautician and the owner of the "Swirl & Curl" beauty salon in Brooklyn. After joining the Ihne–Palomba–Stivaletti scheme, Musella listed his occupation on his 1981 tax return as "private investor" and his short term capital gains ballooned to $745,662.00. SF 28–30.

Musella invoked his Fifth Amendment privilege against self-incrimination when asked by the SEC if he discussed Texasgulf, Garfinckel, Marathon, Penn Central or Signode with Stivaletti. Musella also invoked his Fifth Amendment privilege when asked if he gave anything of value to Stivaletti and when asked to identify and describe all conversations he had with DeAngelis concerning these securities. PX 10 at 712–713, 717.

### E. *Musella's Relationship with DeAngelis*

DeAngelis and Musella met in the late 1950's and became close friends. During the period from August 1981 through the end of 1982, they spoke to each other at least two or three times per week. Tr. at 209, 239–240. DeAngelis testified that

they spoke often and "discussed everything ... that two people can discuss," including stocks. SF 31; Tr. at 209, 216, 381.

DeAngelis testified that he and Musella began discussing the stock market in 1977 or 1978. According to DeAngelis, "[w]e talked about shells, we talked about dividends, we talked about taking control of a company, how much stock to vote, the chairman of the board on the chair [sic], all conversations that would come up." Tr. at 242. Despite these extensive conversations with Musella, DeAngelis told the Court that he did not know that Musella had never purchased a security in his life until Musella purchased shares of Garfinckel in August of 1981. DeAngelis was unable to explain to the Court how he discussed securities for over four years with a man who had never purchased securities in his life. *Id.* at 376–377.

DeAngelis also testified at trial that he did not know until "reading this case" that he and Musella did business with the same Merrill Lynch broker, Gus Drakos, in Cedarhurst, New York. DeAngelis testified that DeAngelis' son recommended that he open an account with Drakos. *Id.* at 368–370.

DeAngelis was interviewed by telephone on November 3, 1981 by SEC Investigator Edward Harrington as part of a SEC investigation into suspicious trading in Marathon Oil. During the interview, Harrington asked DeAngelis if he knew Dominick Musella, whose trading in Marathon options had also come to Harrington's attention. Harrington testified that DeAngelis told him he did not know Dominick Musella. Tr. at 389. Although defendant claims that Harrington's testimony is "incredible," Defendant's Post–Trial Brief at 18, the Court finds Harrington highly credible.

Following the initial questioning by Harrington, DeAngelis was subpoenaed to appear before the SEC on December 16, 1981 as part of the SEC's investigation into trading in Marathon options. DeAngelis appeared but he refused to testify, invoking his Fifth Amendment privilege. *Id.* at 161, 360–361.

## II. CONCLUSIONS OF LAW [2]

### 1. DeAngelis Violated Section 10(b) of the Securities Act and Rule 10b–5

■ To establish that the defendant violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder, the SEC must show that the defendant made improper use of confidential material information in connection with the purchase or sale of securities, and that the defendant acted with *scienter.*[3] *Dirks v. SEC,* 463 U.S. 646, 659–660, 103 S.Ct. 3255, 3263–64, 77 L.Ed.2d 911 (1983); *United States v. Carpenter,* 791 F.2d 1024, 1033–1034 (2d Cir.1986), *aff'd, Carpenter v. United States,* 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987); *Aaron v. SEC,* 446 U.S. 680, 695, 100 S.Ct. 1945, 1955, 64 L.Ed.2d 611 (1980) (*scienter* requirement).

■ For purposes of Section 10(b) and Rule 10b–5, an employee makes improper

---

**2.** Any conclusion of law that is a finding of fact should be deemed to be a finding of fact.

**3.** Section 10(b) provides that:
[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ...
(b) [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
Rule 10b–5 provides that:

[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,
(a) [t]o employ any device, scheme, or artifice to defraud,
(b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under they were made, not misleading, or
(c) [t]o engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

use of confidential information when he obtains material, non-public information intended to be used only for a proper purpose and uses it in breach of a fiduciary duty or other relationship of trust and confidence to his employer. *United States v. Carpenter,* 791 F.2d at 1033–1034; *Dirks,* 463 U.S. at 654, 103 S.Ct. at 3261.

 The requisite fiduciary duty can be found where the person is an "insider," *see, e.g., SEC v. Texas Gulf Sulphur,* 401 F.2d 833 (2d Cir.1968), or a tippee of such a person, *Dirks,* 463 U.S. at 659, 103 S.Ct. at 3263, or it can be found where an employee, like Ihne, misappropriates confidential information from his employer and trades on it. *See, e.g., United States v. Carpenter,* 791 F.2d at 1024; *SEC v. Materia,* 745 F.2d 197, 203 (2d Cir.1984); *SEC v. Musella ("Musella I"),* 578 F.Supp. 425, 438–439 (S.D.N.Y.1984). This duty also applies where a tippee, like DeAngelis, trades on such misappropriated information when he knew or should have known it was misappropriated. *See, e.g., SEC v. Carpenter,* 791 F.2d at 1032; *United States v. Newman,* 664 F.2d 12, 16–19 (2d Cir.1981), *cert. denied,* 464 U.S. 863, 104 S.Ct. 193, 78 L.Ed.2d 170 (1985); *Musella I,* 578 F.Supp. at 437–439.

In *Newman,* two employees of separate investment banking firms misappropriated material, non-public information concerning proposed mergers and acquisitions that had been entrusted to their employers by clients of the firms. The investment banking firm employees tipped this information to defendant Newman, a securities trader, who purchased securities before the information was publicly disseminated and made a substantial profit. This Circuit held that the misappropriation of confidential information by the two investment bank employees and Newman, their tippee, constituted fraud "in connection with" the purchase or sale of a security in violation of Section 10(b) and Rule 10b–5.

> By sullying the reputation of [the investment bankers'] employers as safe repositories of client confidences, appellee and his cohorts defrauded those employers as surely as if they took their money.

*Newman,* 664 F.2d at 17.

In the opinion for a preliminary injunction in this case, the court (Haight, J.) observed that

> [b]y endorsing the alternative "misappropriation" theory of Rule 10b–5 liability [in] *Newman* ..., the Second Circuit gave legal effect to the commonsensical view that trading on the basis of improperly obtained information is fundamentally unfair, and that the distinctions premised on the source of the information undermine the prophylactic intent of the securities laws.

*Musella I,* 578 F.Supp. at 438. *Accord Materia,* 745 F.2d at 201; *see also United States v. Carpenter,* 971 F.2d at 1024 (employee reporter's misappropriation of information regarding articles to appear in *The Wall Street Journal* and subsequent trading by tippee was a breach of duty to the reporter's employer and a violation of Rule 10b–5).

### a. *Ihne Breached His Duty to Sullivan & Cromwell by Stealing Confidential Client Information*

 Ihne owed a duty to Sullivan & Cromwell, his employer, and to clients of Sullivan & Cromwell not to misappropriate material, non-public information entrusted to him by Sullivan & Cromwell clients. Ihne had an absolute duty not to trade based upon misappropriated confidential client information and not to disclose this information to persons outside Sullivan & Cromwell. *See Carpenter,* 791 F.2d at 1033–1034; *Materia,* 745 F.2d at 201–202; *United States v. Newman,* 664 F.2d at 16–19; *Musella I,* 578 F.Supp. at 439.

Ihne, as Manager of Office Services at Sullivan & Cromwell, knew from repeated office memoranda that his firm had a strict policy requiring that all information learned in connection with employment be kept confidential. Ihne breached his duty when he misappropriated information concerning Sullivan & Cromwell clients and target companies of these clients. *See Musella I,* 578 F.Supp. at 439.

Stivaletti knew that the information Ihne was giving him was stolen from Sullivan & Cromwell in the course of Ihne's employment with the firm. Stivaletti recruited Musella to join the scheme and directed Musella to make trades based on Ihne's misappropriated information.

Although Musella did not know the name of the source of information given to him by Stivaletti, Musella knew that the information was illegally obtained from an inside source. Musella referred to that source as "The Goose Who Laid the Golden Egg." On one occasion Musella showed Stivaletti an article on insider trading with a cartoon depicting sources of inside information. Musella asked Stivaletti which one of the sources depicted was providing Stivaletti's information. Stivaletti replied that it was one of them. Musella also paid Stivaletti his portion of the profits in cash as part of the arrangement and received advice from Stivaletti on how to avoid detection.

b. *DeAngelis is Liable as a Tippee Because He Knew or Should Have Known that He was Trading on Misappropriated Non–Public Information.*

■■■ A tippee who knows or is reckless in not knowing that he was trading on misappropriated non-public information violates Rule 10b–5. As this court (Haight, J) stated in granting summary judgment against two other defendants in this action,

> the issue is whether a tippee, wherever he stood in a chain of tippees, "either knew or should have known that he was trading on improperly obtained non-public information."

**4.** The misappropriation theory of liability does not require a showing of a benefit to the tipper; nevertheless, the tippers here benefitted from their actions. Ihne clearly received a benefit from disclosing the non-public information because he received a share of the profits. Musella's tipping to DeAngelis was a gift to his long-time friend. *See Dirks v. SEC,* 463 U.S. at 663–664, 103 S.Ct. at 3266 ("[t]he elements of fiduciary duty and exploitation of nonpublic information also exist when an insider makes a gift of confidential information to a trading relative or friend.")

*SEC v. Musella ("Musella II"),* 678 F.Supp. 1060, 1062 (S.D.N.Y.1988) (citing *Musella I,* 578 F.Supp. at 442). *See also Dirks v. SEC,* 463 U.S. at 660, 103 S.Ct. at 3264; *Carpenter,* 791 F.2d at 1032, 1034; *SEC v. Vaskevitch,* 657 F.Supp. 312, 314 (S.D.N.Y.1987).[4]

■■ The testimony elicited at trial together with the documentary evidence before the Court establish by a preponderance of the evidence that Musella relayed the stolen, non-public information from Sullivan & Cromwell to DeAngelis and that DeAngelis, in turn, knew or should have known that he was trading on stolen, non-public information.[5] The Court is mindful that the SEC's evidence is largely circumstantial and is thus not without some degree of uncertainty; however, several factors give the Court confidence that it has drawn a proper inference from the record evidence. *See Herman & MacLean v. Huddleston,* 459 U.S. 375, 390–391 n. 30, 103 S.Ct. 683, 692 n. 30, 74 L.Ed.2d 548 (1983) ("proof of *scienter* required in [securities] fraud cases is often a matter of inference from circumstantial evidence. If anything, the difficulty of proving the defendant's state of mind supports a lower standard of proof [than by a preponderance of the evidence].").

First, DeAngelis' trading paralleled Musella's trading and always occurred shortly after Musella received the stolen information from Stivaletti. DeAngelis bought Marathon Oil just before the close of the market on the same day that Musella received the inside information from Stivaletti and made his own Marathon purchases. DeAngelis not only purchased Marathon options but purchased one of the two specific series of options that Stivaletti told

**5.** Even if Musella never expressly told DeAngelis what the source of his information was, the success of Musella's information and its unlikely source (Musella) at a minimum put DeAngelis on notice to question the origin of the information. As previously held in this case, conscious avoidance of the source of confidential information in the context of insider trading does not defeat *scienter. Musella II,* 678 F.Supp. at 1063.

Musella to buy. DeAngelis next purchased Penn Central stock a few days after Musella made his own purchases of stock on Stivaletti's instructions to purchase stock. Finally, DeAngelis began purchasing Signode the same day Stivaletti telephoned Musella from Hong Kong and told Musella that there was going to be a tender offer for Signode. Although Musella did not begin to purchase Signode until a few days after DeAngelis because Stivaletti had told Musella to wait until he returned from Hong Kong, Musella and DeAngelis spoke on the day DeAngelis bought Signode.

Second, the amounts involved and the financing of the trades suggest that DeAngelis' confidence that these investments would "pan out" quickly was unusually high, and thus suggestive of insider trading. DeAngelis' investments in these stocks were unusually large in light of his previous trading history. DeAngelis' purchase of $64,000 of Marathon options was his first options purchase in over three years and over twice as large as his previous two options transactions. DeAngelis did not even complain to his broker when he learned soon after he had placed the order that the cost of the options was $20,-000-$30,000 more than his broker had estimated. His purchase of $120,742.44 of Penn Central stock was also very large. His purchase of $518,868.33 of Signode stock was by far the largest securities transaction of his life. In order to finance this trading, DeAngelis was able to borrow substantial amounts of funds from DeAngelis Jewelers—a business in which he had no financial interest.

Third, DeAngelis' testimony concerning his discussions with Musella about Marathon, Penn Central, and Signode and his reasons for his purchases of these stocks are not credible. DeAngelis told the Court that he purchased Marathon in part because he had read articles in foreign newspapers and in an Australian publication. He was unable to produce these articles or to recall any of the details about these articles at trial. In fact, Stivaletti told Musella about the pending takeover of Marathon on October 29, 1981, and both Musella and DeAngelis made enormous purchases before the close of the market that day and just before the public announcement the next day of the takeover.

DeAngelis' testimony that he bought Marathon because he had made money on Penn Central and because he knew the government would take his profit in taxes is also not believable and is inconsistent with the facts. Tr. at 267. DeAngelis actually purchased Penn Central after he purchased Marathon. Tr. at 162–163; PX 4 (DeAngelis' Response to Request to Admit). Moreover, his profits on the Penn Central transaction were only $4,661.33 while the purchase price on the Marathon options was $64,217.34. Id.

The explanation DeAngelis offers for purchasing Penn Central stock is not credible and is contrary to the facts. He testified that he purchased Penn Central in November of 1981 because he believed that the government was going to subsidize the railroad and because of the great value of the railroad's land holdings that could be sold at a profit. However, according to Moody's Industrial Manual 1982, a standard reference for investors, Penn Central had conveyed its entire railroad holdings to Conrail in 1976—five years before DeAngelis purchased the stock—and had also sold all of its real estate holdings in the late 1970's. Tr. at 230–233.

DeAngelis further asks the Court to believe that he invested half a million dollars in Signode based on an article he read in a Teamsters booklet and that it was he who brought Signode to the attention of Musella. The Court finds this testimony beyond credulity given that DeAngelis is unable to produce this publication and began purchasing Signode on the very day that Stivaletti telephoned Musella from Hong Kong to tell him that Signode was going to be the subject of a tender offer.

Fourth, John Malizia, the son of a close friend of DeAngelis, concluded that DeAngelis was trading on information not available to the general public. Malizia testified that he thought that DeAngelis was getting his information from "people that knew that something about what was go-

ing on with the particular instruments ... someone that did know what was happening." Tr. at 421. Malizia has so much confidence in the accuracy of DeAngelis' "strong[ ] recommendation" to buy Signode that despite never having heard of Signode, he purchased $123,621.43 of Signode stock with funds borrowed in part from his family and friends. *Id.* at 419.

Fifth, DeAngelis' explanation that he and Musella discussed these stocks as two investors also suggests that he manufactured his explanations for his purchases. Musella, who had never made a securities purchase before purchasing Garfinckel in August of 1981, reported income for 1979 and 1980 of $6,642 and $4,361, respectively, and listed his occupation as "beautician" and owner of the "Swirl & Curl" beauty salon in Brooklyn. DeAngelis testified, however, that he and Musella began discussing the stock market in 1977 or 1978.

Sixth, the Court does not credit DeAngelis' testimony that he did not know that Gus Drakos was Musella's broker when DeAngelis and his wife opened an account with Drakos. DeAngelis was unable to offer any credible explanation to the Court how it was that out of the thousands of Merrill Lynch brokers in New York, both he and Musella decided to use Gus Drakos in Cedarhurst, New York. DeAngelis' claim that he did not know that Drakos was Musella's broker is also belied by DeAngelis' observation that

> [i]f we suspected that Dominick [Musella] had inside information and we wanted to follow him, inasmuch as Drakos knew Richard [Stolfi—DeAngelis' colleague at the Teamsters office], all we had to do was find out what he bought and follow him. We didn't need Dominick to tell us anything, if that's what we wanted to do.... All we had to do was say, Rich [Stolfi], call up the guy you recommended, find out what he's [Musella's] doing and just follow him.

Tr. at 378–379. DeAngelis thus asks the Court to believe that he knew that Stolfi recommended a broker [Drakos] to Musella (his friend for over twenty years and the person with whom he "discussed every-

thing ... that two people can discuss" including the stock market) and that he also used Drakos as a broker, but it was not until "reading this case" that he realized that he and Musella did business with the same broker. The Court finds this testimony incredible.

■ Finally, DeAngelis denied even knowing Musella—his friend for over twenty years with whom he admitted at trial that he discussed Marathon before purchasing it—when SEC investigator Edward Harrington telephoned DeAngelis shortly after his large purchases of Marathon options. This false exculpatory statement evidences consciousness of guilt and has independent probative value of *scienter.* *See United States v. DiStefano,* 555 F.2d 1094, 1104 (2d Cir.1977); *United States v. Johnson,* 513 F.2d 819, 824 (2d Cir.1975).

#### c. *DeAngelis Traded on Material Information.*

■ The information Musella gave DeAngelis regarding the potential tender offers and acquisitions was clearly material in that there was "a substantial likelihood that, under all the circumstances, the omitted fact[s] would have assumed actual significance in the deliberations of the reasonable shareholder." *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). *See also Basic, Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988) (expressly adopting the *TSC Industries* standard of materiality for Section 10(b) and Rule 10b–5 violations). A reasonable investor would unquestionably regard the information DeAngelis received about Marathon, Penn Central, and Signode as significantly altering the "total mix" of information available in the market place. *Basic v. Levinson,* 108 S.Ct. at 983. Moreover, news of an impending transaction that is expected to increase the value of a security is especially likely to affect an investor's decision to buy, hold, or sell stock. *See, e.g., SEC v. Shapiro,* 494 F.2d 1301 (2d Cir.1974); *SEC v. Materia,* CCH Sec.L. Rep. ¶ 99,583 1983 WL 1396 (S.D.N.Y. 1983); *aff'd,* 745 F.2d 197 (2d Cir.1984); *Musella I,* 578 F.Supp. at 443 ("there is no

question that the information allegedly tipped to the [defendants] by Alan Ihne was material...."").

The Court therefore concludes that DeAngelis is liable under Section 10(b) and Rule 10b–5 because he traded on information that he knew or should have known was non-public material information stolen from an inside source.

### 2. DeAngelis Violated Section 14(e) of the Exchange Act and Rule 14e–3

■ Section 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(e), authorizes the SEC, with respect to tender offers, to "define and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative." [6] Rule 14e–3, promulgated by the SEC in 1980, established a "disclose or abstain from trading" duty for any person who is in possession of material information that relates to another person's tender offer, which information he knows or has reason to know is nonpublic and was acquired, directly or indirectly, from the bidder or the issuer of the securities subject to the tender offer.[7] As long as the alleged wrong relates directly to a tender offer, it is not necessary that the tender offer have commenced or that it even take place for liability to attach under Rule 14e–

3. *O'Connor & Assoc. v. Dean Witter Reynolds, Inc.*, 529 F.Supp. 1179, 1192 (S.D.N.Y.1981). *See also United States v. Chestman*, 704 F.Supp. 451, 455–459 (S.D. N.Y.1989) (citing the SEC's reasons for adopting the Rule).

■ DeAngelis violated Rule 14e–3 by his trades in Marathon options and Penn Central stock.[8] At the time that Ihne misappropriated the information from Sullivan & Cromwell and DeAngelis traded, Mobil and Esmark, the acquiring companies on whose behalf Sullivan & Cromwell were working (the "offering persons" within the meaning of the rule), had taken substantial steps to commence tender offers for Marathon and Penn Central, respectively. With respect to Marathon, Sullivan & Cromwell was retained on October 27, 1981 to provide legal advice concerning a proposed tender offer by Mobil Corporation. Mobil launched the tender offer for Marathon on October 31, 1981. Although Esmark eventually decided not to make a tender offer for Penn Central, Sullivan & Cromwell worked on the proposed acquisition of Penn Central during October of 1981.

For the reasons discussed *supra* with respect to DeAngelis' violation of Rule 10b–5, DeAngelis knew or should have known he was in possession of material, non-public information about pending

---

**6.** Section 14(e) provides in full:

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitations for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. The Commission shall for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative.

**7.** Rule 14e–3 provides in relevant part:

(a) If any person has taken a substantial step or steps to commence, or has commenced, a tender offer (the "offering person"), it shall constitute a fraudulent, deceptive or manipulative act or practice within the meaning of

section 14(e) of the Act for any other person who is in possession of material information relating to such tender offer which information he knows or has reason to know is nonpublic and which he knows or has reason to know has been acquired directly or indirectly from:

(1) [t]he offering person,

(2) [t]he issuer of the securities sought or to be sought by such tender offer, or

(3) [a]ny officer, director, partner or employee or any other person acting on behalf of the offering person or such issuer, to purchase or sell or cause to be purchased or sold any of such securities or any securities convertible into or exchangeable for any such securities or any option or right to obtain or to dispose of any of the foregoing securities, unless within a reasonable time prior to any purchase or sale such information and its source are publicly disclosed by press release or otherwise.

**8.** The SEC did not include defendant's Signode trades in this claim.

tender offers. Material, inside information about a pending tender offer is likely to come from the acquiring company or someone acting on its behalf. Thus, even assuming that Musella did not know the specific source of the inside information he passed along to DeAngelis, DeAngelis was a sufficiently sophisticated investor to know or have reason to know that the source of Musella's information was either the "offering person" or someone acting on its behalf (here, Sullivan & Cromwell).[9]

Therefore, DeAngelis' trades in Marathon options and Penn Central stock violated Section 14(e) and Rule 14e–3.

3. Injunctive Relief is Appropriate and Necessary.

 Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d) (1982), empowers the SEC to seek a "temporary or permanent injunction" against "any person [who] is engaged or is about to engage in acts or practices constituting a violation" of the securities law. The Commission need only show a reasonable likelihood that the securities violations will be repeated. *Materia,* 745 F.2d at 200; *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1102 (2d Cir. 1972). Fraudulent past conduct can support an inference of a reasonable expectation of continued violations. *Manor Nursing Centers, Inc.,* 458 F.2d at 1100. Moreover, a court may consider additional factors bearing on the likelihood of future violations, including the degree of *scienter* involved, lack of remorse, attempts to mislead the SEC, as well as opportunities to repeat the prohibited conduct. *SEC v. Tome,* 833 F.2d 1086, 1095 (2d Cir.1987), *cert. denied sub nom, Lombardfin SPA v. SEC,* 486 U.S. 1014, 108 S.Ct. 1751, 100 L.Ed.2d 213 (1988).

 In this case, the Court finds a compelling need for an injunction. DeAngelis' violations were knowing violations that extended over a long period of time and in-

volved large sums of money. His continuation of his illegal trading after the SEC questioned him about his Marathon trades and his false statements to SEC Investigator Harrington show his willingness to violate the law. Moreover, DeAngelis has shown no remorse for his conduct. The manufactured and incredible explanations DeAngelis gave this Court for his trading demonstrate his continued lack of remorse and willingness to shirk responsibility for his illegal conduct.

Therefore, in light of the defendant's past violations, the degree of *scienter* involved, the apparent lack of remorse of the defendant, and the opportunity for future violations, the Court permanently enjoins DeAngelis from violating Section 10(b) and 14(e) of the Exchange Act and Rules 10b–5 and 14e–3.

4. Disgorgement and Prejudgment is Appropriate.

 Courts have authority to order disgorgement of insider trading profits in a SEC enforcement action. *SEC v. Tome,* 833 F.2d at 1096; *SEC v. Materia,* 745 F.2d at 201; *SEC v. Texas Gulf Sulphur Co.,* 446 F.2d 1301, 1307–1308 (2d Cir.); *cert. denied,* 404 U.S. 1005, 92 S.Ct. 562, 30 L.Ed.2d 558 (1971). By prohibiting inside traders from profiting from their wrongdoing, disgorgement facilitates enforcement of the federal securities laws. *SEC v. Tome,* 833 F.2d at 1096.

 Prejudgment interest on damages awarded pursuant to a violation of the federal securities laws is a matter of judicial discretion. *Rolf v. Blyth, Eastman Dillon & Co.,* 637 F.2d 77, 86 (2d Cir.1980); *Norte & Co. v. Huffines,* 416 F.2d 1189, 1191 (2d Cir.1969), *cert. denied sub nom, Muscat v. Norte & Co.,* 397 U.S. 989, 90 S.Ct. 1121, 25 L.Ed.2d 396 (1970); *Quintel Corp. v. Citibank, N.A.,* 606 F.Supp. 898, 914 (S.D.N.Y.1985). The personal wrong-

9. Rule 14e–3 also applies where the source of the inside information was the issuer of the target's securities or someone acting on the issuer's behalf. Rule 14e–3(a)(2). Thus, because he knew or should have known that he had inside information about proposed tender of-

fers, DeAngelis necessarily must have known that the source of his information was either the acquiring company or the target company, or someone acting on behalf of one of those companies.

doing of a defendant should be considered in determining that an award of interest is in accord with doctrines of fundamental fairness. *Norte & Co.*, 416 F.2d at 1191; *SEC v. Tome*, 638 F.Supp. 638, 639 (S.D.N. Y.1986), *aff'd*, 833 F.2d 1086 (2d Cir.1987). In the context of Section 10(b) and Rule 10b–5 actions, proof of *scienter* is ·sufficient to justify an award of prejudgment interest. *See Rolf v. Blyth*, 637 F.2d at 87.

■ A district court sitting in New York may use the rate of interest used to calculate prejudgment interest under New York law in calculating prejudgment interest in federal securities law cases. *Quintel Corp. v. Citibank*, 606 F.Supp. at 898. Under New York law, prejudgment interest is calculated at a simple rate of 9% for all claims arising after June 25, 1981. N.Y. C.P.L.R. § 5004 (McKinney 1988); *see Quintel Corp. v. Citibank*, 606 F.Supp. at 915.

■ Accordingly, the Court orders DeAngelis to disgorge all profits from his illegal transactions in the securities of Penn Central, Marathon Oil, and Signode, plus simple interest at a rate of nine (9) percent *per annum* on the profits from transactions in the securities of the above mentioned companies, calculated from the date the defendant fully liquidated his positions in the securities.

## CONCLUSION

For the reasons stated above, the Court finds in favor of the plaintiff on all claims. Defendant is permanently enjoined from future violations of § 10(b) and § 14(e) of the Securities Exchange Act of 1934 and Rules 10b–5 and 14e–3 promulgated thereunder. Defendant is further ordered to disgorge all profits from the aforementioned illegal transactions plus simple interest at a rate of nine (9) percent per annum.

Counsel for the SEC is directed to submit to the Court on ten (10) days notice a proposed order in accordance with this Opinion.

SO ORDERED.